[Crim. No. 7093. In Bank. June 20, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. MELVIN T. DARLING, Defendant and Appellant.

16

Edward T. Mancuso, Public Defender, under appointment by the Supreme Court, and Joseph I. McNamara, Deputy Public Defender, for Defendant and Appellant.

Stanley Mosk, Attorney General, John S. McInerny and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

WHITE, J.—Defendant was found guilty by a jury of first degree murder of Alex T. Malcomson. The penalty was fixed at death and the jury further found that the defendant was sane at the time the crime was committed. Defendant's motion for a new trial was thereafter denied. From the ensuing judg-

ment this appeal is automatic pursuant to the provisions of section 1239, subdivision (b) of the Penal Code.

Notwithstanding defendant's protestations in communications addressed to this court that he received a fair trial, was guilty of the offense charged against him and wanted no review whatsoever of his conviction, this court nevertheless, in conformity with the purpose and intent of the aforesaid section, appointed Edward T. Mancuso, Public Defender of the City and County of San Francisco, whose office represented defendant at his trial, to also represent the latter on this automatic appeal, and appointed counsel has filed briefs and orally argued the cause before us.

As to the factual background surrounding this prosecution, the record reveals that defendant arrived in San Francisco from Seattle in possession of a pilot's license, wallet, credit and identification cards and blank checks stolen from one Bruce Leer. He registered first at the Gates Hotel, then purchased new luggage and registered at the St. Francis Hotel as Bruce Leer. He twice attempted to cash checks as Bruce Leer and was refused on each occasion. In a bar at the hotel he met the deceased and had some drinks with him. The latter agreed to show some place of interest in San Francisco to defendant, who invited the deceased to the former's room for the stated purpose of freshening up but with the intent of robbing him. Drinks were ordered and served while the men were in the room. Thereafter defendant took a gun from a holster on his belt, pointed it at the deceased and demanded his wallet. The victim, disregarding the gun, attempted to escape from the room whereupon defendant struck him and pushed him back. When the deceased again attempted to escape defendant shot him twice in the head, struck him with the gun about the head and held him to the floor in a choking position until deceased was dead. Defendant then removed the deceased's wallet, credentials, a wrist watch and a ring, washed blood from his hands, placed a "Do Not Disturb" sign on the outer door of the room and left the hotel. He returned to the Gates Hotel where he picked up the luggage he had left there, returned to the St. Francis Hotel, picked up his and the deceased's belongings and finally departed.

Defendant registered that night at the Commodore Hotel in San Francisco, under the name of his victim, Alex Y. Malcomson, and using the latter's credentials. The following day, after defendant cashed checks again using the deceased's

credentials, he rented an automobile and drove to Las Vegas where he again posed as his victim. He went from there to Palm Springs and from the latter city to Long Beach where he first registered in a hotel under an assumed name but later transferred to another hotel and registered as Alex Y. Malcomson. That evening, which was the fourth day following the homicide, defendant made two recordings which contained a complete confession and mailed them to the San Francisco police. He was apprehended the following day by officers of the Long Beach Police Department.

Defendant has given detailed statements of his activities to both the Long Beach and the San Francisco police. The voluntary or involuntary nature of these statements has not been put in issue, and it does not appear from an examination of the record that there was any impropriety in either procuring the statements or in offering them into evidence. Other independent evidence corroborated the defendant's statements in large part. Defendant did not take the stand in his own behalf during the trial.

From the foregoing evidentiary narrative it is manifest that it could not be successfully urged that the evidence is insufficient to support the judgment of conviction of murder in the first degree, and such a contention is not made. (Pen. Code, § 189.)

Three contentions are made on this appeal in behalf of defendant: (1) that it was an abuse of discretion for the trial judge to refuse to allow defendant the right and privilege of addressing the jury on his own behalf; (2) that the court erred in allowing certain photographs to be introduced in evidence; and (3) that the court was guilty of misconduct which deprived defendant of a fair trial on the issue of insanity.

At an early stage in the trial proceedings defense counsel stated to the court: "... At this time I am going to move the Court for an order permitting Mr. Darling to propound a question or two to a witness, if he so sees fit now and then—it will not occur very often—and for permission also to address the jury at the appropriate time." The court responded as follows: "Well, I think perhaps the better way to do it, any question that Mr. Darling wants to propound, I think he should ask through you. I am perfectly willing to discuss it with you further, if there is some particular reason he wants to do it that way, but he is certainly free to consult with you, and he can advise you of any question he wants asked." Counsel for defendant then replied: "Very well, I

will consult further on the matter, your Honor." However, at no time thereafter did counsel renew his motion. During the jury deliberations on the penalty phase of the case the jury inquired of the court whether it was permissible for defendant to make a statement in his own behalf. The court replied that it was not permissible, that defendant had exercised his prerogative to refrain from testifying, which he had the right to do, and that should answer the jury's question.

Counsel contends that a defendant in a capital case has the right to appear other than through a single attorney. It appears that he has such a right. The Constitution provides that an accused has the right in a criminal prosecution "to appear and defend, in person and with counsel." (Const., art. I, § 13.) In *People* v. *Ah Wee*, 48 Cal. 236, 238, the court held that while in a capital case each side is entitled to have two counsel address the jury, the court could in its discretion permit as many counsel as it deemed proper to argue in behalf of either the prosecution or a defendant. (See also Pen. Code, § 1095.) However, the issue in the instant case is not whether defendant has been denied the right to representation by more than one counsel, but whether he may personally participate in a trial where he is duly represented by one or more attorneys. In *People* v. *Mattson*, 51 Cal.2d 777 [336 P.2d 937], this court considered a defendant's contention that he had the right to both conduct his own defense and to be provided with the services of court-appointed counsel to advise and assist him. In denying that such a right existed we had occasion to state at page 789: ". . . defendant is not entitled to have his case *presented* in court *both by himself and by counsel* acting at the same time or alternating at defendant's pleasure. [Citations.] So long as defendant is represented by counsel at the trial, he has no right to be heard by himself [citations]. . . ." And at page 797 we further stated: "We are not saying that the trial court may not in its discretion, upon what it may determine to be good cause shown, permit a party who is represented by counsel to participate in the conduct of the case. . . . These matters are within the sound discretion of the trial judge, who is in a position to appraise the courtroom situation and determine what procedure will best promote orderly, prompt and just disposition of the cause. The court, however, should not permit a litigant both to have counsel and to actively participate in the conduct of the case (as by conducting examina-

tion of witnesses, interposing objections, arguing points of law or of fact, addressing the jury, etc.) *unless the court on a substantial showing* determines that in the circumstances of the case *the cause of justice* will thereby be served and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered, hampered or delayed." (Emphasis added.) (See also *People* v. *Jackson,* 186 Cal.App. 2d 307, 317 [8 Cal.Rptr. 849].)

The record fairly reveals that in the instant case the court left the matter open for counsel to make the "substantial showing" necessary to entitle defendant to participate in the proceedings. No further effort was made by counsel to make the necessary showing, and there is nothing in the record at the present time which suggests that a substantial showing might have been made or in what manner defendant might have been particularly prejudiced by the ruling of the trial judge. It is manifest that if the court was invested with discretion to allow defendant to participate in some manner, as counsel now concedes and decisional law holds, certainly no abuse thereof can be attributed to the court's conduct in the instant circumstances.

Counsel next contends in behalf of defendant that error was committed in allowing three photographs of the deceased to be introduced as exhibits. The photographs were of the head and neck of the victim and showed the bullet and other wounds inflicted by defendant. There was no duplication, each of the photographs being of a different area. None of the photographs portrayed autopsy surgical marks.

It is claimed that the exhibits served no purpose other than to inflame the minds of the jurors, and in support thereof counsel refers to testimony of the medical expert to the effect that he did not require the photographs for the purpose of refreshing his memory in order to recall the findings he made in an autopsy.

It is not of particular significance that the doctor did not need the photographs to refresh his recollection. They were not offered or received in evidence as an aid to his recollection but rather as an aid to the jury in illustration and clarification of the doctor's testimony. (See *People* v. *Elmore,* 167 Cal. 205, 212 [138 P. 989].) The court remarked, in overruling the objection to their admission, that they were necessary for the purpose of illustrating the doctor's testimony. In opposing the objection the assistant district attorney noted that the pictures were not gruesome, and that they were illustrative

of certain neck wounds which the public defender had sought to establish could have been received in some manner other than that advanced by the prosecution.

The admission of photographs rests within the sound discretion of the trial judge. (*People* v. *Ditson*, 57 Cal.2d 415, 446 [20 Cal.Rptr. 165, 369 P.2d 714]; *People* v. *Kemp*, 55 Cal.2d 458, 478 [11 Cal.Rptr. 361, 359 P.2d 913], and cases there cited.) But "[w]hen allegedly gruesome photographs are presented, the trial court must decide whether their probative value outweighs their probable prejudicial effect." (*People* v. *Love*, 53 Cal.2d 843, 852 [3 Cal. Rptr. 665, 350 P.2d 705].) We have viewed the photographic exhibits and are satisfied they cannot be characterized as gruesome, nor can it reasonably be said that they illustrate relevant factual matters in a manner unfair to defendant. That they were of some probative value to us seems obvious. Certainly, the record fails to disclose any abuse of the discretion vested in the trial judge in concluding that the probative value outweighed the possible prejudicial effect, if any. (See *In re Brubaker*, 53 Cal.2d 37, 48 [346 P.2d 8]; *People* v. *Burkhart*, 211 Cal. 726 [297 P. 11]; Cf. *People* v. *Burns*, 109 Cal.App.2d 524, 541-542 [241 P.2d 308, 242 P.2d 9].)

Counsel for defendant finally contends that in ad-mining sanity in a legal sense the trial court was guilty of hering to the M'Naughton "right-wrong" rule for deter-misconduct which deprived the accused of a fair trial. It is urged that this court overrule its prior decisions and adopt the "product of mental disease or defect" rule, known as the Durham test.

The following facts are urged as proof that defendant is mentally ill: the manner in which the crime was conceived, planned and executed; the use of the deceased's name in registering at hotels, cashing checks and appropriating the latter's credit, and statements made by defendant after his apprehension. Such statements indicate the defendant's reasons for first committing the homicide and later surrendering himself, that he has some difficulty in remembering and in recounting some details of the killing and subsequent events, and that he uses coarse and profane speech. Nevertheless such evidence firmly establishes that defendant was aware at all times that his actions were wrong and improper. A psychiatrist testified that defendant was a psychotic; that he had no control over his most dangerous urges; that his loss

of control occurs only when he becomes emotionally upset or excited, or when his conscious self becomes dulled, as with alcohol. The doctor concluded that the defendant recognized his inability to control his actions when exposed to certain stimuli and for that reason sought incarceration in order that he might be restrained from other acts of violence. The doctor further described the defendant's condition as one of a low degree of emotional stability. He stated that all persons are subject to inability to control themselves if subjected to sufficient pressures; that the defendant's breaking point was an unusually low one, and that the breaking point came in the instant circumstances when his victim panicked in defendant's hotel room while defendant was attempting to rob him. The doctor conceded that defendant could differentiate between right and wrong at all times, but contended that defendant could not restrain himself from doing what he did. The jury, however, also had before it the testimony of Dr. Walter Rapaport and Dr. John F. Card, appointed by the court pursuant to section 1027 of the Penal Code. Dr. Rapaport testified that he examined defendant twice; that he "found no evidence of any mental illness whatsoever at the time of my examinations, nor did I find any evidence that any mental illness was present at the time of the offense. . . . He was in control of his own mind and knew what he was doing. . . . I found nothing upon which I could base any opinion that he was suffering from any mental illness or had been suffering from any mental illness." Dr. Card, who also examined the defendant and testified that the latter could distinguish between right and wrong and knew the nature and quality of his acts, stating as the basis for his opinion "the complete absence of any indication of mental illness, of insanity or psychosis, the freedom from any confusion or disturbance or distortion in thinking, his complete orientation, the absence of delusions, the absence of hallucinations, the absence of any abnormal mood changes, his ability to evaluate, to judge; in other words, to think as a rational person."

The foregoing contention of defense counsel concedes that defendant was and is legally sane within the M'Naughton rule, but argues for the adoption of a different rule. The Durham rule, the basic postulate of which is the capacity for choice and control of one's actions, is urged as applicable in the instant circumstances. (See *United States* v. *Currens*, 290 F.2d 751, 774.) This court, however, has consistently rejected such contentions, holding that changes, if any, are legislative

matters. In *People* v. *Nash*, 52 Cal.2d 36 [338 P.2d 416], we reviewed the history of judicial and implicit legislative acceptance of the M'Naughton rule in California, and concluded that any change therefrom should come from the Legislature. As recently as 1960, in *People* v. *Rittger*, 54 Cal.2d 720 [7 Cal. Rptr. 901, 355 P.2d 645], we reiterated our conclusions in the *Nash* case and stated at page 732 : ''The history of the judicial and implicit legislative acceptance of M'Naughton in this state is related in the *Nash* case, *supra*, pp. 43-48 of 52 Cal.2d. Nothing which defendant says in the present case convinces us that we should depart from the view that, whatever we may think of the theoretic soundness of the M'Naughton tests, such tests have in effect become an integral part of the legislative scheme for the appraisal of criminal responsibility in California and any change therein should come from the Legislature.'' We are not persuaded by the arguments advanced in the case with which we are here concerned that the issue is now a judicial rather than a legislative one.

Defendant was fairly tried and justly convicted. For the foregoing reasons, the judgment and the order denying his motion for a new trial are, and each is, affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Dooling, J., concurred.