[Crim. No. 1903. Fourth Dist. Nov. 20, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. CLYTUS M. DERISO, Defendant and Appellant.

Gould & Aronson and Stanley C. Gould, Jr., for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

GRIFFIN, P. J.—Defendant-appellant was charged with murdering (Pen. Code, § 187) Richard (Rick) Adams (count one) and James Benesh (count two) on July 6, 1962. He entered a plea of not guilty to both counts. A jury found him guilty of first degree murder on the first count and second degree murder on the second count, and fixed the penalty on the first count at life imprisonment. Defendant appeals from the judgment and verdict and from the order denying his motion for a new trial.

The murders were committed on July 6, 1962, at 6:30 a.m., in a pickup camper parked behind the Longbranch Bar in Garden Grove, California. Bob Adams, the father of one victim, Rick Adams, heard noises coming from the camper, which was parked about 30 feet away from his cottage near the Longbranch Bar. Mr. Adams hurriedly dressed and ran to the camper. Then he heard the voice of his son, Rick, appealing for mercy. Mr. Adams attempted to open the door of the camper but discovered that it was locked. With the help of another son, Tom, he forced the door open. They observed the other victim, James Benesh, lying face down on the floor of the camper covered with blood. There was a visible gash 6 inches long in his arm. The defendant was standing astride the body of Benesh, spattered with blood from his neck to his shoes. Defendant stepped out of the camper and asked for help, saying that he had cut his finger.

Bob Adams asked, "Where is Rick?" and defendant replied, "Oh, he had to leave. ... He went some place." Mr. Adams then told his son, Tom, to call an ambulance and the police. Defendant went to the washroom in the Longbranch

Bar. Shortly afterward, Bob Adams went into the washroom to look for defendant and found that he had disappeared.

The police arrived at the scene a few minutes later and observed the body of James Benesh in the camper. While examining the camper, they located the body of Rick Adams lying in an upper bunk in the front portion of the camper. While the police were restraining Bob Adams and Tom Adams from entering the camper, defendant reappeared and said that he was sorry that he ran away.

Officer Antoine of the Garden Grove Police Department then searched defendant and asked him what had happened. Defendant said that he had come to the camper that morning to recover some money that Rick Adams owed him and also to awaken Mr. Adams for a job appointment. He said that he arrived on the scene and found Rick Adams in his bunk in the camper bleeding profusely, and at that time he had gotten some towels and attempted to stop the flow of blood, but soon realized that Rick Adams was dead or dying. The defendant related that then Mr. Benesh confronted him and attacked him with a knife and that he had gotten the knife away from Mr. Benesh and had killed him with it.

Later, at the police station, the defendant was again interrogated and at this time he said that he had come to the camper about 6:15 in the morning and that Mr. Benesh had opened the door and admitted him. Defendant said that he asked Benesh where Rick Adams was and was told that Rick had gone. Defendant said that Benesh then stated that Rick was ill in bed in the camper. Defendant claimed that he then observed blood on the curtains screening the bed from the main portion of the camper and that he looked behind the curtains and saw Adams there with an open wound in his neck. He did not mention attempting to stanch the flow of blood from the wound. He said that at that time he turned around and observed Benesh charging at him with a knife in his hand. The defendant said that Benesh accused him of misconduct with Mrs. Benesh. Defendant claimed that he blocked the knife thrust and knocked Benesh down. Defendant said that Benesh then asked him to talk the situation over and defendant agreed. They began to clean up the blood in the camper and then defendant attempted to leave. Benesh attacked defendant again, and at this time defendant got the knife away from Benesh. Benesh reached for the door of a cupboard and defendant, thinking that he was attempting to get a gun, stabbed him in the back. Defendant said that he then dropped the knife and that Benesh picked it up, but

defendant knocked Benesh to the floor with his foot. Defendant asserted that at this time he opened the camper door for Bob Adams. When questioned about the whereabouts of the knife, defendant said that he last observed it in Benesh's right hand as he was in the camper.

The autopsy surgeon found a number of wounds caused by a knife in the body of James Benesh, but the wound that caused his death was a large stab wound which began in the back and ended in the left chest. It was the surgeon's opinion that only a powerful individual could have caused such a wound. The surgeon testified that Rick Adams' death was caused by three cuts in his throat, all of which transected the major arteries and structures of the neck. The surgeon testified that these wounds would also have required a great deal of force. Defendant weighed 296 pounds. The surgeon indicated that both deaths occurred about the same time. It was stipulated that Rick Adams had blood type ''B,'' James Benesh had blood type ''A,'' and defendant had blood type ''O.''

An expert criminalist of the Orange County Sheriff's Office testified that he examined defendant's clothing and typed the blood marks found thereon. He found defendant's blood and that of Benesh on defendant's shoes and the blood of both victims on the pants, shirt and jacket. He found the blood of the victim Adams sprayed on defendant's shirt and testified that the spray was so fine that it was his opinion that it had been sprayed under pressure. There were also smudges and smears of Adams' blood on the shirt and there were matching spots or stains of Adams' blood on the pants and jacket. The blood of Adams was found in spots and in spurt marks on the walls and ceiling of the camper above the bunk in which Adams' body was found. Defendant's blood was found on the curtain that separated the camper and on a bath towel in the camper. The blood of Benesh was found on the kitchen table in the camper and in the area where his body was found.

Eight days after the murder, a knife was found in a storm drain near the Longbranch Bar. It was stipulated that this was the knife used by defendant. Defendant testified that he threw the knife away in the location where it was found. The police located a sales slip in defendant's car from Leonard's store. It was stipulated at the trial that the knife was purchased by defendant at the store between 6 p.m. and 9:30 p.m. on the night before the murder.

A former bartender in the Longbranch said that defendant told him that he was in love with Mary Benesh and wanted to get rid of Benesh. Defendant's roommate testified that defendant claimed that Benesh had threatened him and defendant said, "Who does he think he is, threatening me, I could kill him first." About 3 a.m. on July 6, three hours before the killings, defendant had breakfast with three men. He paid for the breakfast for the four, saying that it would probably be his last chance.

At the trial, defendant testified that he bought the knife at the request of Rick Adams who needed it to make some repairs in the bar which Adams was operating. He said that he gave the knife to Adams, who put it in the camper. He testified that on the morning in question he went to the camper to awaken Adams and upon entering the camper discovered Adams' body, was attacked by Benesh, defended himself and stabbed Benesh. He said that he did not know who killed Rick Adams. Defendant claimed that he told Mr. Adams that Rick had gone because he did not want Mr. Adams to see Rick's body. He said that after leaving the restroom in the Longbranch Bar, he went to a nearby intersection and threw the knife away and then returned to the scene where he was taken into custody.

Defendant's first contention is that the evidence is largely circumstantial and it is not sufficient to support the verdict of the jury. Furthermore, it is argued that the defendant consistently maintained in his statements to the police that he had not killed Rick Adams and that he killed Mr. Benesh in self-defense. Upon close examination, however, it appears that defendant's statements contained considerable equivocation and that sometimes he changed his story to make it conform to what the police had discovered to be the truth. For example, upon alighting from the camper, he responded to Bob Adams' question by saying that Rick Adams was not there. Later, he tried to explain this deception by saying that he wished to spare Mr. Adams the discovery of his son's death. But this equivocation won him sufficient freedom to enable him to conceal the murder weapon. He then returned to the scene and during the first interrogation said that he last saw the murder weapon in the camper alongside the body of Benesh. After the police had discovered the knife and that defendant had purchased the knife the night before the murders, defendant admitted the purchase and the concealment. He never explained his earlier equivocations in this regard.

Furthermore, defendant's earlier stories contained no explanation of how the fine spray of blood from Richard Adams' body got all over his clothing. At the trial, this damaging evidence was met with the explanation that Benesh had somehow snapped a bloody towel in defendant's direction and this spattered him with Rick Adams' blood. Yet this explanation was not made until the existence of the bloody spray on defendant's clothing was pointed out to him.

Although much of the evidence is circumstantial, it is extremely convincing. Defendant and Benesh were the only other persons in the camper when Mr. Adams heard Rick Adams' cry for mercy. The door was forced open and defendant was the only person left alive in the camper. Immediately he fled the scene and hid the weapon with which both murders were accomplished. That both killings were homicidal is beyond question. Richard Adams' throat was cut three times and each of the wounds was mortal. Benesh was killed by a wound which began in his back and extended around to the left side. Defendant admits that he killed Benesh but says that someone else killed Adams. He claims not to know who did this. Yet Bob Adams testified that defendant was locked in the camper when Rick Adams was killed. Bob Adams heard Rick Adams' voice pleading for mercy. This must have been before his throat was cut. ■ In *People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778], the court said that when the sufficiency of the evidence to support the verdict of guilty is attacked on appeal, the appellate court must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence. ■ If the circumstances reasonably justify the verdict of the jury, the appellate court will not be warranted in interfering with that verdict even though the circumstances might also be reasonably reconciled with the innocence of the defendant. ■ Again, in *People* v. *Daugherty*, 40 Cal.2d 876 [256 P.2d 911], the court said that the test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt. ■ Tested by these requirements, the evidence is sufficient. Indeed, the circumstances were such that no reasonable hypothesis can be drawn which would point toward the innocence of the defendant.

■ Defendant's next contention is that the trial court unreasonably restricted the *voir dire* examination of the

prospective jurors. The record indicates that the *voir dire* examination occupied 107 pages of the reporter's transcript. At the outset, the court asked numerous questions of the members of the jury panel, and then it permitted counsel to ask such questions as they might desire. The only limitation that was put on the questions asked was that counsel were not permitted to query the jurors as to points of law. At first, counsel misunderstood this instruction to mean that he could not ask questions as to the jurors' bias against certain legal doctrines which would be involved in the case. When the court perceived that defense counsel had this misconception, it corrected his understanding of the instruction that had been given. At the outset, the court asked counsel to direct their questions to the entire panel as a unit, but as peremptory challenges were used and new jurors entered the box, counsel were permitted to question the new jurors individually. Although defense counsel had 20 peremptory challenges, he exercised only eight of these. In addition to this, the court liberally permitted challenges for cause when the prospective juror exhibited any bias. During the *voir dire* examination, defense counsel made no specific objection to the procedure being followed. It is true that on several occasions he made complaining remarks to jurors indicating that he felt the judge was picking on him, but he did not make any objection to the court and elicit a ruling. On at least five occasions when defendant's counsel was offered an opportunity to query jurors who had been drawn from the panel to replace jurors who had been excused, counsel said that he had no questions. Indeed, the tenor of counsel's objection is difficult to follow, since he admits in his brief that the court followed the rule laid down by our Supreme Court in *People* v. *Edwards*, 163 Cal. 752 [127 P. 58].

It has been held repeatedly that questions on *voir dire* must be limited to matters which might disclose a juror's disqualification or the grounds for a challenge for cause. (*People* v. *Edwards, supra,* 163 Cal. 752; *People* v. *Estorga,* 206 Cal. 81 [273 P. 575]; and *People* v. *Canales,* 12 Cal.App. 2d 215 [55 P.2d 289].) ▪ Attempts to indoctrinate the jury as to the meaning or applicability of particular rules of law under the guise of *voir dire* examination may be properly restricted by the trial court. (*People* v. *Jefferson,* 84 Cal. App.2d 709 [191 P.2d 487]; *People* v. *Spraic,* 87 Cal.App. 724 [262 P. 795]; *People* v. *Harrington,* 138 Cal.App.2d Supp. 902 [291 P.2d 584].) ▪ *People* v. *Rigney,* 55 Cal.

2d 236, 244 [10 Cal.Rptr. 625, 359 P.2d 23], states the settled rule that a juror may not be examined on *voir dire* solely for the purpose of laying the foundation for the exercise of a peremptory challenge. ██ It does not appear that defendant suffered prejudicial error in his *voir dire* examination of the jurors.

██ Defendant also urges that he was curtailed in his cross-examination of a prosecution witness. This contention arises out of an incident that occurred near the end of the trial. The prosecutor stated that a further blood examination was being run and that the results would be available on Monday. The court ordered that if the test proved to be negative, defendant must be furnished with a copy and the court advised thereof. The proceedings of Monday, December 17, 1962, the day on which arguments were conducted by counsel, are not in the record, but defendant argues that the prosecutor failed to notify him that no such tests had been made. He believes that the jury was thereby somehow left with the impression that a test had been run and that it was a positive test. Next, it is argued that this evidence was before the jury without the right of cross-examination, and that defendant's rights were thereby infringed. In reply to this contention, the Attorney General simply says that there was no such evidence before the jury and therefore nothing upon which a cross-examination could have been based. We deem this view of the incident to be correct. Both sides had rested before Monday. The exchange was merely a minor detail in a long hard-fought trial. There was a great deal of evidence before the jury as to blood and blood tests. Their consideration of this evidence was certainly not affected by what was no more than a minor verbal exchange between counsel at the close of the trial. Indeed, they were instructed by the court not to speculate upon evidence which had been excluded by the court.

Defendant also contends that the prosecutor's conduct in connection with the failure to conduct the test amounts to a suppression of evidence. Here again, the defendant is going outside the record in an attempt to show the basis for his claimed error. ██ The rule is well established that appellate courts will only consider errors which are supported by the record presented to the appellate court. (*People* v. *Mike,* 163 Cal.App.2d 466 [329 P.2d 519].) See also *People* v. *Pedesclaux,* 156 Cal.App.2d 174 [319 P.2d 93], and *People* v. *Macias,* 161 Cal.App.2d 594 [326 P.2d 936].) Furthermore,

the defendant does not challenge the truth of the statement by the district attorney that it was technically impossible to run the test which had been contemplated.

Defendant urges that the criminalist who testified for the prosecution did not lay sufficient foundation for his testimony because only about 10 per cent of the blood spots on defendant's clothing was tested and typed. The criminalist explained his failure to test all the blood spots by saying that they were too numerous. During his cross-examination of the criminalist, defendant's attorney wet a handkerchief in water and snapped it to illustrate his theory of how the fine spray of blood got on defendant's clothing. On redirect, the criminalist testified that he had made similar tests in the laboratory using a towel similar to that found in the camper and real blood. Defendant argues that the latter tests were too dissimilar from the actual conditions in the trailer to be comparable and therefore this evidence was received without proper foundation. It has been repeatedly stated that the trial court has a wide discretion in admitting evidence of experiments conducted either in or out of the courtroom. (*People* v. *Roberts*, 40 Cal.2d 483 [254 P.2d 501]; *People* v. *Glab*, 15 Cal.App.2d 120 [59 P.2d 195].) Certainly, there was more foundation for the test conducted by the criminalist than there was for the demonstration performed by defendant's attorney in the courtroom. The question of the admissibility of either experiment was for the trial judge, and the weight to be given to this evidence was ultimately a question for the jury. The jury was perfectly able to decide whether the fine spray of blood found on defendant's clothing got there while it was spurting out of the wounds of Rick Adams or whether it was caused by the snapping of a bloody towel.

The last contention made by defendant is that the trial court improperly admitted photographs and colored slides of the victims' bodies at the scene and autopsy pictures. The autopsy surgeon testified that it was necessary to use the photographs to show the basis for his opinion as to how the wounds were caused and the amount of force necessary to inflict such wounds. The photographs of the camper and the victims were used to illustrate the testimony of the criminalist who testified as to the location and nature of the various blood stains and other physical evidence which was found at the scene. Defendant objected to the admission of certain of the slides and to the fact that

some of the slides were enlarged. It has been frequently held that photographs and slides of dead bodies and other gruesome scenes may be admitted if they have evidentiary value. The trial court must weigh the probative value of the evidence against its possible prejudicial effect. (*People* v. *Darling*, 58 Cal.2d 15, 21 [22 Cal.Rptr. 484, 372 P.2d 316].) The question is one which is addressed to the discretion of the trial court. (*People* v. *Reese*, 47 Cal.2d 112, 120 [301 P.2d 582] ; *People* v. *Burwell*, 44 Cal.2d 16, 34 [279 P.2d 744].)

Here, the trial court exercised considerable care before admitting the photographs and slides. Some of this material was omitted by agreement after the court suggested that it was unnecessary. Only those slides which were considered useful to the autopsy surgeon in his testimony were received. Counsel for defendant used some of the slides in the examination of his own criminalist witness. The fact that the photographs were such as might arouse a feeling of revulsion is not, in itself, sufficient basis for excluding the evidence. (*People* v. *Dunn*, 29 Cal.2d 654, 660 [177 P.2d 553] ; *People* v. *Guldbrandsen*, 35 Cal.2d 514, 521, 522 [216 P.2d 977].) It might also be mentioned that the jurors were advised during the *voir dire* examination of the existence of these slides and of their probable use. Those jurors who exhibited a reluctance to face this type of evidence were excused. Because of the evidentiary value of these exhibits and the manner in which they were used, it must be said that the trial court did not err in receiving them.

No error affecting the defendant's susbstantial rights is indicated in the record.

Appeal from the verdict and from the motion for new trial is dismissed. (Pen. Code, § 1237.)

Judgment affirmed.

Coughlin, J., and Brown (Gerald), J., concurred.

A petition for a rehearing was denied December 13, 1963, and appellant's petition for a hearing by the Supreme Court was denied January 7, 1964.