[Crim. No. 10818. In Bank. Nov. 27, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RONALD WAYNE WHITE, Defendant and Appellant.

Charles M. Berg, under appointment by the Supreme Court, and Luther Barrow for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—A jury found defendant guilty of the first degree murder of Anne Ransom and fixed the penalty at death. The court denied motions for a new trial and for reduction of the penalty to life imprisonment. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

The prosecution presented the case to the jury on the theory that the killing was murder of the first degree committed in the perpetration of burglary, robbery, and rape. Mrs. Ransom was a waitress at the Big Time Bar in La Puente. About 11 p.m. on April 20, 1966, the bar manager, Mrs. McAndrew, left Mrs. Ransom in charge with the responsibility of closing the bar at 2 a.m. When Mrs. McAndrew returned to the bar at 7:45 the next morning she found Mrs. Ransom, with a bloody wound in her head, lying naked on her back on a pool table. The victim did not move or speak. Mrs. McAndrew summoned sheriff's officers. Mrs. Ransom was taken to a hospital, where she died on April 22. The cause of death was a .22 caliber bullet that entered the middle of the forehead and lodged at the back of the brain. On the right side of her head was a very recent skull fracture that could have resulted from a fall. Her genital area was not injured. A test for sperm was inconclusive because she was menstruating.

On the morning of April 21, articles of Mrs. Ransom's clothing lay on the barroom floor, a chair, and a table. A man's coat was on a chair. In the coat were a label with the name of a shop in Lafayette, Louisiana, and a tag with the name "White." A .22 caliber shell casing was on the floor. Only 15 or 20 pennies were in the bar till. Mrs. Ransom's cash record showed that when she closed the bar she had $50 in currency and $15.50 in coins.

At 10 a.m. on April 21, Detective Sergeant Nichols and two other officers of the sheriff's department went to the Royal

Palms Apartments, three blocks from the Big Time Bar, and talked with Dennis Seiler, a regular customer of the bar. Seiler told the officers that he and defendant had been the last customers to leave the bar the night before and that when Mrs. Ransom closed the door behind them at 2 a.m., defendant went toward the parking lot and Seiler walked home. Seiler agreed to come to the sheriff's station and give a statement and the officers left his apartment.

Defendant also lived at the Royal Palms. After interviewing Seiler, Sergeant Nichols and Sergeant Rowley went to defendant's apartment. At that time these officers did not know that Mrs. Ransom's wound was caused by a bullet or that a .22 caliber shell casing had been found in the bar or that the man's coat found there contained labels with defendant's last name and the name Lafayette, Louisiana, a town that defendant had left four or five weeks before. The only information Nichols had about defendant was that given by Seiler.

. Sergeant Nichols knocked on the door of defendant's apartment and it swung open. Nichols called, "Sheriff's Office, is anyone home?" Defendant answered, "Just a minute," and came to the door in his bare feet and without a shirt. Nichols displayed his badge and said, "We're Sheriff's officers," and defendant said, "Come on in." As Nichols walked through the living room he saw a .22 caliber Beretta pistol in a holster. He picked up the pistol and asked defendant if it was his. Defendant replied that it was.[1] He was asked if he objected to the officers' looking around the apartment and said, "No, go ahead."

Nichols asked defendant what he had done the night before. Defendant said he was "partying." Nichols asked if he had been at the Big Time Bar, and defendant said he had not. When asked what clothes he wore the night before, defendant pointed out a suit and shirt on hangers, still clean, freshly pressed, and apparently not worn. Nichols asked defendant where he had been drinking, and defendant said that on second thought he believed he had stopped at the Big Time Bar before going home. Nichols said the police "were trying to determine what had happened the night before, we were taking statements from everybody concerned," and asked defendant if he would come to the sheriff's station and give a statement. Defendant agreed and began dressing. Nichols

---

[1] Later tests showed that the fatal bullet was fired from defendant's pistol.

asked defendant where he slept, and defendant pointed to one of twin beds. Nichols lifted the mattress and found a sock with coins tied in it. Defendant said that the sock was his,[2] that he saved change, and that it contained about $15. As defendant picked up his wallet Nichols saw that it contained a number of bills and asked how much money was in it. Defendant said approximately $40.

At the station Sergeant Nichols left defendant in the squad room while he talked with other officers for three or four minutes. Nichols learned from his fellow officers that about $50 in bills and $15.50 in coins had been taken from the bar and that the coat found there had the name "White" and a Lafayette label in it. By this time Nichols knew that defendant was from Lafayette. He took the coat into the squad room and asked defendant to try it on. Defendant did so, and it appeared to fit him.

Subsequently developed evidence showed a significant correspondence between the amount of money defendant had and the amount taken from the bar. The sock contained $16.67 in coins (including only two pennies) and defendant had $87 in currency (including about 25 one dollar bills) in his wallet when he was booked. On the afternoon of April 20 he had cashed his pay check of $44.10. From 5 p.m. until about 1 a.m. he and Grant Dickson were in various bars drinking beer and "looking for girls." About 1 a.m. defendant drove Dickson home and then went to the Big Time Bar.

About 2 a.m. on April 21 a deputy sheriff on routine patrol saw defendant outside the bar. Defendant said he was waiting for a girl to close the bar.

Defendant's roommate visited defendant in jail about three weeks after the killing. Defendant then said, "I did it, but I don't know why. . . . [I] didn't need the money or anything."

Defendant did not testify to the jury. Outside their presence he testified that he had not consented to the officers' entry and search of his apartment on the morning of April 21. The trial judge properly found on the basis of Sergeant Nichols' contrary testimony that defendant freely consented to the entry and search. (See *People* v. *McLean,* 56 Cal.2d 660, 664 [16 Cal.Rptr. 347, 365 P.2d 403] ; *People* v. *Burke,* 47 Cal.2d 45, 49 [301 P.2d 241].)

---

[2]In fact the sock was one of a pair that defendant's roommate had taken off and left on the floor the previous evening.

758

■ Sergeant Nichols' testimony that at the sheriff's station defendant consented to try on the coat found in the bar and that the coat appeared to fit him was properly admitted. The privilege against self-incrimination, with its attendant requirement of the warnings prescribed by *Miranda* v. *Arizona,* 384 U.S. 436, 479 [16 L.Ed.2d 694, 726-727, 86 S.Ct. 1602, 10 A.L.R.3d 974], does not apply to the furnishing of that kind of physical evidence. (See *United States* v. *Wade,* 388 U.S. 218, 222 [18 L.Ed.2d 1149, 1154-1155, 87 S.Ct. 1926]; *People* v. *Sudduth,* 65 Cal.2d 543, 546 [55 Cal.Rptr. 393, 421 P.2d 401]; *People* v. *Ellis,* 65 Cal.2d 529, 534-535 [55 Cal. Rptr. 385, 421 P.2d 393]; *People* v. *Graves,* 64 Cal.2d 208, 210 [49 Cal.Rptr. 386, 411 P.2d 114].) ■ The trying on of the coat was not a "critical stage" of the proceeding when absence of counsel could derogate from the fairness of the ensuing trial. (*Gilbert* v. *California,* 388 U.S. 263, 267 [18 L.Ed.2d 1178, 1183, 87 S.Ct. 1951]; cf. *United States* v *Wade, supra,* 388 U.S. 218, 227 [18 L.Ed.2d 1149, 1157-1158].)

■ Defendant contends that the evidence shows neither burglary, robbery, nor rape or attempted rape and therefore is insufficient to establish first degree murder. He emphasizes the lack of testimony as to how he effected entrance to the bar after Mrs. Ransom had closed it, as to whether he accomplished sexual penetration of the victim, and as to whether any specific monies found in his possession were coins or bills from the bar. His argument in this regard virtually ignores the evidence summarized above. That evidence is sufficient to support the jury's determination.

■ It is asserted that the admission in evidence of a photograph of deceased was prejudicial error. The photograph is a black-and-white depiction of the victim as Mrs. McAndrew found her on the morning of April 21. The trial court did not abuse its discretion by receiving it in evidence. (*People* v. *Mathis,* 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65]; *People* v. *Harrison,* 59 Cal.2d 622, 627 [30 Cal.Rptr. 841, 381 P.2d 665]; *People* v. *Darling,* 58 Cal.2d 15, 21 [22 Cal. Rptr. 484, 372 P.2d 316].)

■ Defendant contends that he was denied a fair trial because two attorneys represented the People in the courtroom while defendant was represented by only one deputy public defender. Defendant cites no authority for this contention. He states that in courts martial under the Uniform Code of Military Justice established practice requires that counsel for the accused be equal to counsel for the prosecution in number and

rank. He asks this court to enunciate a similar rule of practice for criminal trials. The initial decision on the number of attorneys assigned to defendant's defense was properly that of the public defender. Had the deputy who represented defendant felt inadequate to try the case because he was facing two attorneys or for any other reason, he could have requested additional assistance from the office of the public defender or could have explained his difficulties to the trial judge and asked for the appointment of an associate. Nothing in this record indicates that the task of defendant's lawyer was in any way increased because of the presence of more than one prosecuting attorney. In any case, lawyers differ enormously from one another in their professional skills and modus operandi. The court could not assure "equal" representation on both sides of a case by requiring numerical equality of counsel. ▆▆ It is further contended that the trial judge abused his discretion by guiding and counselling the two prosecuting attorneys throughout the trial. The judge, however, was alert to protect the rights of defendant. On occasion he cautioned the prosecution and interjected questions of his own to insure that proper foundation was established for proffered evidence. The two instances of asserted misconduct particularly referred to by defendant were outside the presence of the jury. In one instance after the judge had sustained a defense objection to evidence offered by the prosecution, he pointed out in what form the offered proof could be admissible. The other instance occurred during the trial of the issue of guilt when the prosecution offered in evidence incriminating admissions made by defendant at the sheriff's station after he tried on the coat. Defendant objected that receipt of this evidence would violate *Miranda* v. *Arizona, supra,* 384 U.S. 436, 467 [16 L.Ed.2d 694, 719-720], because the admissions were made during custodial interrogation without the required warnings as to his constitutional rights. After colloquy as to the legality of the offered evidence the judge stated that unless the prosecution considered it vital to its case "I can't understand or appreciate the logic or wisdom of possibly asking that error be committed." The prosecution then withdrew its offer of proof. Thus defendant's present complaint goes to a matter that resulted in a ruling favorable to him.

The judge's participation in the proceedings was even-handed. The issue of guilt was tried fairly and properly.

At the penalty stage of the trial the prosecution renewed its

offer of evidence of defendant's admissions, and the judge overruled defendant's renewed objection. Sergeant Nichols testified that on April 21 at the sheriff's station he showed defendant the coat that was found in the bar and "I asked him if it was his coat. He replied, 'No.' I asked him if he would mind trying the coat on. He said, 'All right.' He stood up. I handed him the coat, he put it on. He then took the coat off and gave it back to me. I told him that the coat appeared to fit him and, besides that, that I believed his last name was written inside the coat. He hesitated for a while. He stated, 'It's my coat.' He said, 'I know I'm in trouble. I killed that broad.' "[3]

██ Statements obtained by "interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice" are inadmissible. (*Miranda* v. *Arizona*, *supra*, 384 U.S. 436, 464-465 [16 L.Ed.2d 694, 717-718].) ██ Thus "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) ██ The "custodial" element of the accusatory stage when the right to counsel attaches does not depend on the interrogator's subjective intent; "custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived." (*People* v. *Arnold*, 66 Cal.2d 438, 448

[3]In the proceedings outside the jury's presence that resulted in the judge's decision to admit these incriminating statements, Sergeant Nichols testified that when defendant made the admissions Nichols at once told him to be quiet, that it was the officer's duty to advise him of his constitutional rights, and that he was under arrest for suspicion of robbery and assault with intent to commit murder. Officers then warned defendant that he had the right to counsel and to remain silent and that his statements could be used against him. These warnings met the requirements of *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

Two months later *Miranda* v. *Arizona*, *supra*, 384 U.S. 436, 473 [16 L.Ed.2d 694, 723], decided that a person held for interrogation must also be told that if he is indigent a lawyer will be appointed to represent him. Because defendant was not so advised the People at the trial (four months after the *Miranda* decision) did not seek to use statements and real evidence obtained from him by sheriff's officers after they told him he was under arrest.

[58 Cal.Rptr. 115, 426 P.2d 515]; *People* v. *Kelley,* 66 Cal.2d 232, 246 [57 Cal.Rptr. 363, 424 P.2d 947].)

 No objective indicia of restraint or compulsion accompanied Sergeant Nichols' request that defendant go to the sheriff's station to make a statement. The officer "told him that we had talked to several people that were down there, we were trying to determine what had happened the night before, we were taking statements from everybody concerned, and would he give us a statement. He stated that he would." At the station, however, the sergeant learned of evidence against defendant that, taken with what he had discovered at defendant's apartment, focused suspicion on defendant. The sergeant obviously and properly had no intention of permitting defendant to leave without explaining that evidence. He testified that his purpose when he confronted defendant with the coat was to give him an opportunity to make a "reasonable explanation," not to elicit a confession. His first question, however, elicited the damaging denial that the coat was defendant's. This denial was not a reasonable explanation; it was an apparent falsehood clearly indicating that defendant felt that something more than silence was expected of him and that the pressures of the situation had disabled him from making a rational response. The next words of the sergeant—"that the coat appeared to fit him and . . . I believed his name was written inside"—could be and were understood by defendant in context as an accusatory statement that produced an admission of homicide. The prosecution did not sustain its burden of showing that the admission was not the product of custodial interrogation (*People* v. *Kelley, supra,* 66 Cal.2d 232, 246; *People* v. *Arnold, supra,* 66 Cal.2d 438, 448) and the statements should not have been received in evidence.

At the penalty stage of the trial defendant introduced testimony of family and associates as to his previous good reputation, behavior, and record. The People emphasized his apparent callousness and lack of remorse in connection with Mrs. Ransom's slaying as warranting the death penalty. It was to this stated end that the prosecution used defendant's unlawfully obtained admission that "I know I'm in trouble. I killed that broad." Also to this end and to show that the prospect of defendant's rehabilitation was not good, the People introduced evidence that defendant attempted to escape from custody on the day of his arraignment by exchanging clothes and identification with his cellmate. This

evidence was properly received, but the People's closing argument erroneously invited the jury to speculate from that evidence as to the possibility that in the future prison officials might be ineffective in the discharge of their duties and permit defendant to escape.[4] Thus the jury were diverted from their duty and responsibility of selecting the penalty in violation of the principle underlying our holding in *People* v. *Morse,* 60 Cal.2d 631, 643 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]. (*In re Pike,* 66 Cal.2d 170, 172-173 [57 Cal. Rptr. 172, 424 P.2d 724].)

 The prosecuting attorney in arguing as to selection of penalty correctly stated that "The Court is going to inform you that this is a matter of your independent individual determination. And then the 12 of you arrive at whatever penalty you feel appropriate." Then, however, he proceeded improperly to derogate their responsibility both as individual jurors and collectively as a jury by arguing, "It is not the 12 of you alone. It is everyone who has had connection with the case that will have the consequences of the imposition of the maximum penalty."[5] Of course the death sentence is imposed by the judge and carried out by the administrative official charged with that duty, but the selection of the penalty is for the jury alone and the defendant is entitled to have them deliberate with that responsibility in mind.

---

[4]The prosecuting attorney argued, "if you think that Mr. White is remorseful—why, sure he is, folks, that is why he tried to escape from the County Jail and get out of this state. That is why. He has demonstrated that he will take the first opportunity that is available to him and he will try to get out of custody. He will not take his medicine. He will not take punishment. He will do anything he can to avoid it.

"And, ladies and gentlemen, what would he be like after an escape? More destitute, more desperate than he was at these times."

Defense counsel promptly objected and the trial judge admonished the jury to disregard the last comment.

[5]The inconsistent argument as to this matter in its entirety was, "The Court is going to inform you that this is a matter of your independent, individual determination. And then the 12 of you arrive at whatever penalty you feel appropriate.

"And as you do that, you must never think in terms of, 'I, Juror No. 5, or Juror No. 6, 7, 8,' whatever the number might be, 'am the one who is doing this, who is imposing the maximum punishment.'

"You are, in effect, an adjunct of the administration of justice of the State of California. It is not the 12 of you alone. It is every one who has had connection with the case that will have the consequences of the imposition of the maximum penalty, not just the 12 of you.

"So, as you reflect upon your individual role in this, one of you must not think that, 'I am doing this all by myself. I am considering all of the evidence, all the law applicable, and I am deciding whether the crime is so grave, so monstrous, so serious, so lacking in mitigation, that I feel that this punishment is appropriate.' I would suggest that is not the function you should perform."

The People contend that if there was error in the admission of defendant's illegally obtained statement there was no prejudice in light of the other evidence of defendant's want of remorse, and that any error in the prosecution's argument as to penalty is not prejudicial in light of the court's correct instructions. The choice of penalty, however, rests in the absolute discretion of the jury and "If only one of the twelve jurors was swayed by the inadmissible evidence or error, then, in the absence of that evidence or error, the death penalty would not have been imposed. What may affect one juror might not affect another. The facts that the evidence of guilt is overwhelming, as here, or that the crime involved was, as here, particularly revolting, are not controlling. This being so it necessarily follows that any substantial error occurring during the penalty phase of the trial, that results in the death penalty, since it reasonably may have swayed a juror, must be deemed to have been prejudicial." (*People* v. *Hamilton,* 60 Cal.2d 105, 137 [32 Cal.Rptr. 4, 383 P.2d 412].)

The judgment imposing the death penalty is reversed, and the cause is remanded for retrial on the issue of penalty only and for the pronouncement of a new sentence and judgment as provided by law.

Peters, J., Tobriner, J., and Sullivan, J., concurred.

MOSK, J.—I dissent from reversal of the penalty.

The majority apply impractically rigid evidentiary standards to a proceeding designed not to ascertain guilt, but to assess penalty. In so doing, they overlook the basic purpose of the penalty proceeding, which is to receive evidence "of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty." (Pen. Code, § 190.1.)

I am well aware of the rule that "any *substantial* error occurring during the penalty phase of the trial, that results in the death penalty, since it reasonably may have swayed a juror, must be deemed to have been prejudicial." (Italics added.) (*People* v. *Hamilton* (1963) 60 Cal.2d 105, 137 [32 Cal.Rptr. 4, 383 P.2d 412].)

In the context in which defendant's statement was used, there is certainly no substantial error, and I doubt that there is any error whatever. When defendant was asked to try on a coat—a procedure the majority finds unobjectionable—he admitted the garment was his, and then without further

interrogation voluntarily added, "I know I'm in trouble. I killed that broad." Sergeant Nichols immediately cautioned defendant in a manner the majority finds satisfied the requirements of *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

The unsolicited statement of defendant was clearly admissible. As this court said, unanimously, in *People* v. *Cotter* (1965) 63 Cal.2d 386, 396 [46 Cal.Rptr. 622, 405 P.2d 862]: "Neither this court, nor the United States Supreme Court, has ever taken the position that the desire of a guilty man to confess his crime should be stifled, impeded, discouraged, or hindered in any way."

Assuming *arguendo* that the statement was inadmissible, it strains credulity to find prejudicial error in its use in the penalty phase of the trial. Defendant said "I'm in trouble." This conceded nothing not then evident. "I killed that broad." This was introduced *after* the jury had already found he had in fact killed the waitress. It added no new element. Only applying the term "broad" to the victim might be deemed questionable. Yet that expression is not considered to be criminal argot; it is common language of the street, not pejorative but merely inoffensive slang. (See H. L. Mencken, The American Language, 4th ed. (1938) p. 577.[1]) If that is the manner in which defendant spoke, or regularly speaks, then that is the way in which the jury must accept him and his utterances in weighing "aggravation or mitigation" of the totality of circumstances. In the truth-seeking process there is no justification to conceal that knowledge, whether significant or trivial, from the jury.

Whether the statement in question reflects callousness or lack of remorse is subject to interpretation. But it is not inadmissible, for the jury is entitled to consider defendant's subjective response to the brutal act he committed. Toward that end, the defense produced a witness whom defendant told "he was sorry he did it." The jurors who have the grave responsibility of assessing penalty may weigh all of the defendant's virtues and vices. Remorse, being the echo of a lost virtue, is one of the elements properly considered.

I find no reversible error in the prosecuting attorney's argument to the jury. Defendant's attempt to escape from the

---

[1]Mencken places *broad* for woman in the same category as *law* for policeman, *big-house* for prison, *croaker* for doctor, *bone-orchard* for cemetery, *eye* for detective, *hard-stuff* for metal money, *paper-hanger* for forger.

county jail was his voluntary act. From that established circumstance flows a perfectly rational deduction that defendant was, and in the future might be, a difficult rather than contrite prisoner.

The prosecutor's discussion regarding individual responsibility of the jurors may have been ''inconsistent'' as the majority's footnote 5 suggests. There is a giant step between inconsistency—which ordinarily redounds to the advantage of the defense—and prejudicial error. Any confusion regarding the function of the jurors, individually and collectively, was adequately dissolved by the court in its instructions. It is evident that the jurors were not confused and that they followed the court's instructions, for after returning their verdict they were polled and each juror responded individually that the verdict was his.

I would affirm the judgment in its entirety.

McComb, J., and Burke, J., concurred.