GARY HAROLD KRUEGER, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 8784

December 30, 1976                    557 P.2d 717

*Morgan D. Harris,* Clark County Public Defender, and
*Stephen L. Huffaker,* Deputy, Las Vegas, for Appellant.

*Robert List,* Attorney General, Carson City; *George E. Holt,*
Clark County District Attorney, *H. Leon Simon* and *Elliott
A. Sattler,* Deputy District Attorneys, Clark County, for
Respondent.

## OPINION

By the Court, MOWBRAY, J.:

Gary Harold Krueger, the appellant, was tried to a jury and found guilty of first-degree murder. He has appealed from his judgment of conviction, asserting several assignments of error, which we reject as meritless. We therefore affirm.

### 1. *The Facts.*

On March 5, 1975, at approximately 2:00 a.m., passersby discovered a car containing a man's body off an embankment of East Lake Mead Boulevard in Clark County, Nevada. The highway patrol was summoned. From his examination of the scene, the car's condition, and the multiple injuries to the body, the patrolman concluded that the victim's death could not have been caused by a traffic accident. The car was removed from the scene and processed for fingerprints. An autopsy was performed on the deceased. It revealed that death had been caused by multiple blows to the head, made with great force by a heavy instrument. The victim was identified as James King. A tracer on the car revealed the owner resided at a local trailer park. Early on March 5, police detectives visited the address and found the decedent's wife. They also found Krueger, who had been living at the same address. The detectives inquired whether Mrs. King or Krueger knew the whereabouts of King. They replied that he had left the premises about 11:00 o'clock the previous evening, in a drunken condition. The detectives then told them that King had been found dead, and asked them to come to the police station to give statements.

Krueger and Mrs. King agreed to come to the detectives' headquarters at the Las Vegas Metropolitan Police Department on March 11 for the purpose of giving statements. On that date, Mrs. King telephoned the detectives and advised that she and Krueger would be late for their appointment because of car trouble. Detective Gary Barlow, who was in charge of investigating the crime, offered to furnish a police car for their transportation. The offer was accepted, and the couple arrived at about 11:00 a.m. Detective Barlow and Ken Cook interviewed Krueger. He denied any implication in the crime and gave the detectives a written statement to that effect. He was

excused and returned to the hallway leading into the detectives' headquarters, to wait for Mrs. King. The open hallway is furnished with chairs and serves as a waiting area. Detectives Barlow and Cook left for lunch. In the meantime, Detective Charles Lee was interviewing Mrs. King. Her attorney was present. A polygraph examination was administered by Detective Lee. Mrs. King told Lee how the murder had occurred—that Krueger had axed her husband to death and then disposed of his body out on the highway. With this information, Detective Lee returned to the waiting area and asked Krueger if he would return to the interrogation room. Lee also sent word for Barlow and Cook to return immediately. Lee then advised Krueger of his constitutional rights under *Miranda*.[1] Krueger said he understood them. Lee then advised Krueger that he had received new information about the death of Mr. King, and he asked Krueger if he wanted to make any changes in the statement he had previously given. Krueger replied that he had already given his statement. Lee then stated that he had information indicating that Krueger had killed King with an ax, whereupon Krueger responded that was the way it happened.[2]

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] At the pretrial hearing on the motion to suppress Krueger's statement, Detective Lee testified in part as follows:

"Q  (By Mr. Huffaker) Did you have occasion on March 11 to have Gary Krueger in your office or the office of the Metropolitan Police Department?

"A  Yes.

"Q  Did you talk to him at that time?

"A  Yes, I did.

"Q  What did you say to him at that time, the first time you saw him?

"A  Advised him of his constitutional rights under the *Miranda* decision.

"Q  Did you not—What was the occasion of that? Why did you go talk to Defendant Krueger?

"A  It was subsequent to an interview that I had just completed with Donna King.

" . . .

"Q  And what were those rights that you advised him of?

"A  I read them off the card.

"Want me to read the card?

"The Court:  Do you have the card with you at this time, Detective Lee?

"The Witness:  Yes, sir.

"The Court:  Would this be the very card that you read from at that time, Detective Lee?

"The Witness:  Yes. This is the card that I have carried with me as a homicide investigator since 1969.

Detectives Barlow and Cook, in response to Lee's message, returned immediately and continued the questioning. Barlow again gave Krueger a full *Miranda* warning and had him sign a "Rights of Prisoner-Arrest Card" that sets forth the *Miranda* warnings. Thereafter, Krueger gave a detailed statement regarding the killing and the disposition of the body. The statement was typed, and Krueger signed it.[3]

---

"Q  (By Mr. Huffaker) And would you read what you read to him at that time?

"A  'No. 1:  You have the right to remain silent.

" 'No. 2:  Anything you say can and will be used against you in a court of law.

" 'No. 3:  You have the right to talk to a lawyer and have him present with you while you're being questioned.

" 'No. 4:  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.'

"At that point I asked him the following two questions:

" 'Do you understand each of these rights I've explained to you'—

"Q  Are you reading from the card now?

"A  Yes. I'm reading from the card.

"Q  Thank you.

"A  He replied yes.

" 'Having these rights in mind, do you wish to talk to us now?'

"He replied yes.

"Q  And after that what happened?

" . . . .

" . . .

"I asked him if he wanted to make any changes in his statement.

"Q  Well, he said he didn't, that he denied any further involvement, I think you testified. And I think you testified that—

"A  No. I said that he said he wasn't involved.

"Q  Well, if he said he wasn't involved and that he'd already made a statement—I believe you testified—

"A  Yes.

"Q  —then what happened then? What did you say?

"A  I advised him that we had received some new information. I advised him that we had information that he had used a hatchet on the victim; also advised him that after he disposed of the body he walked back to the trailer park.

"Q  And then what did Mr. Krueger say, if anything?

"A  He said, 'That's the way it happened. I was tired of him beating the kids.' "

[3]During trial, Detective Gary Barlow testified as follows:

"Q  [by Mr. Harmon]  Prior to commencing the interview was Mr. Krueger, the Defendant, advised of any constitutional rights?

"A  Yes, he was.

"Q  Will you describe your procedure in making him aware of certain rights?

"A  He was read his rights off the rights of person arrested card.

"Q  Who read those rights?

"A  I did.

## 2. *The Admission of Krueger's Statement.*

Krueger's principal contention on this appeal is focused on the admission of the written confession which he gave Detective Barlow on March 11. He claims that he did not waive his right to remain silent, and he requested and was denied assistance of counsel. These same arguments were presented before and during trial, and motions to suppress the incriminating evidence were properly denied.

The State has suggested that the detectives were not required to give the *Miranda* warnings because Kreuger was not subjected to custodial interrogation. The State argues that at the time Krueger made the incriminating statements he was not under arrest and had voluntarily appeared for the interview. We do not agree. The record supports the argument as to Krueger's status when he first came to the police station. However, by the time the incriminating statements were made, Krueger's status had changed. When Mrs. King implicated

---

"Q Did you read to him verbatim from the card?
"A Yes.
"Q What happened then?
"A After I read them to him, gave it back to him, he read them and signed them, 'Larry Caccialini' and 'Gary Krueger,' and dated it and put the time on it.
". . .
"Q Detective Barlow, I am handing you the rights card back to you. I would like you to read into the record what you have read to Mr. Krueger March the 11th, 1975.
"A The card is titled 'Rights of a Person Arrested.'
" 'You have the right to remain silent. Anything you say can be used against you in a court of law. You have a right to have an attorney present during any questioning. If you can not afford an attorney, one will be furnished for you free of charge. If you waive these rights you may revoke that waiver at any point of questioning.
" 'I have read the above and fully understand these rights.'
" 'Dated 3–11–75, at 1:00 p.m.,' signed 'Larry Caccialini, Gary H. Krueger.'
"Q Thank you.
"After this card had been signed, did you reiterate any of the rights appearing on the card?
"A Yes, I did.
"Q What did you say in that regard?
"A After he had signed it I told him that I was going to readvise him of his rights again, which I did.
"Q Did you repeat the same rights?
"A Yes, I did. And then I asked him if he understood at this point that he had the right to have his attorney with him right now. And he stated, 'Yes.' "

Krueger, he then became the focus of the investigation, rather than a mere suspect. From then on, he was in custody and entitled to the protection established by *Miranda.* See People v. White, 446 P.2d 993 (Cal. 1968).

Having concluded that Krueger was subjected to custodial interrogation, we turn to consider whether he was denied his rights under *Miranda.* Krueger admits that he waived his right to remain silent at the beginning of the interrogation. He contends on appeal that he revoked that waiver when the detective confronted him with the incriminating evidence received from Mrs. King. The record simply does not support Krueger's contention. He was given the full *Miranda* warning by Lee, and he signed a card and acknowledged that he understood the same. When he was asked if he wished to change his previous statement, he replied in the negative, but he never stated that he did not wish to be questioned by the officers. When Lee, in response to Krueger's statement, said that he (Lee) had information indicating that Krueger had killed King with an ax, Krueger readily responded that was the way it happened. When Detective Barlow returned and resumed the inquiry, Krueger was given another full *Miranda* warning and signed a card acknowledging that he understood the warning and waived his right to remain silent before giving his confession. Krueger did not testify at trial, but he did so at the pretrial hearing on the motion to suppress, and that testimony corroborated Barlow's testimony.[4]

---

[4]Krueger testified on cross-examination, at the pretrial hearing to suppress, as follows:

"Q [by Deputy District Attorney Melvyn T. Harmon] Were you advised by Detective Barlow that you had the right to remain silent?

"A [by Krueger] Yes, sir.

"Q Did he explain to you that anything you said could and would be used against you in a court of law?

"A Yes.

"Q Did he explain to you that you had the right to have an attorney present?

"A Yes, he did.

"Q Did he reemphasize that you are entitled to have one present right there at the time you were waiving a statement?

"A No, he just read me the rights.

"Q Is it your testimony that after you had signed this card that he didn't reemphasize your right to have an attorney present?

"A No, he reread me my rights.

"Q Did you understand those rights when he reread them?

"A Yes, I did.

Under the factual position of this case, we cannot say that Krueger's rights under the Fifth and Fourteenth Amendments were violated.

3. *The Instructions.*

Additionally, Krueger urges that the court's failure to instruct the jury on the elements of manslaughter constituted reversible error. This argument is wholly meritless. An instruction must be given only if there is evidence to support it. Williams v. State, 91 Nev. 533, 539 P.2d 461 (1975); Walker v. State, 85 Nev. 337, 455 P.2d 34 (1969). In the instant case, there is no evidence to support any theory of manslaughter. Manslaughter requires ". . . a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing." NRS 200.050. There is no such evidence in the record before us. The court did not err in instructing the jury.

4. *The Prosecutor's Closing Argument.*

Krueger's final assignment of error involves improprieties in the prosecutor's closing statement, which he claims prejudiced him. Only two of the alleged improprieties were objected to at trial and may be considered on appeal. Walker v. State, 89 Nev. 568, 516 P.2d 739 (1973); Clark v. State, 89 Nev.

---

"Q  Did you understand that you had the right to have an attorney present?

"A  Yes, sir.

"Q  Did any one threaten you in any way to get you to sign this card?

"A  No, sir.

"Q  I am showing you now what has been marked as State's Proposed Exhibit 76. It consists of ten pages. Would you examine that document and state whether you recognize it?

"A  Yes, sir. This is the document that I signed.

"Q  Is this the statement which you signed on March the 11th, 1975?

"A  Yes.

"Q  Does this appear to reproduce the interview which you had with Detective Barlow and Sergeant Anderson?

"A  Yes it does.

"Q  Prior to signing this statement [his confession] were you given an opportunity to read it?

"A  Yes, I was.

"Q  Were you allowed to make any corrections which you felt were appropriate?  .

"A  Yes."

392, 513 P.2d 1224 (1973). Prosecutorial misconduct is a ground for reversal only if it prejudices the substantial rights of the accused. Mears v. State, 83 Nev. 3, 422 P.2d 230 (1967); Kuk v. State, 80 Nev. 291, 392 P.2d 630 (1964). We have reviewed the remarks complained of, and they clearly were not of sufficient magnitude to prejudice Krueger or distract the jury.

The judgment of conviction is affirmed.

GUNDERSON, C. J., and BATJER, ZENOFF, and THOMPSON, JJ., concur.