[No. H000785. Sixth Dist. Apr. 28, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS CHRISTOPHER CELAYA, Defendant and Appellant.

COUNSEL

Howard J. Specter, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Thomas A. Brady and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PHILLIPS, J.*—Defendant appeals from a judgment of conviction of grand theft. Following denial of defendant's *in limine* motion to exclude his confession, defendant waived trial by jury and agreed to submit the matter on the transcript of the preliminary hearing. It was agreed the defendant's maximum sentence would be two years in state prison if found guilty. Defendant reserved his appeal right including that relating to his motion to exclude the confession. Defendant was found guilty by the court and was thereafter sentenced to a two-year term in state prison.

Defendant's only contention on appeal is the trial court erred in denying the motion to exclude the confession. We find defendant's contention meritorious and therefore reverse the judgment.

At 12:30 a.m. on January 22, 1985, Anthony Gulizia, Jr., was awakened by a noise in his front yard. He saw a man outside with what appeared to

---

*Assigned by the Chairperson of the Judicial Council.

be about four radios. Gulizia called the Santa Clara County Sheriff's office, and two deputies came by and took a report. About an hour later, Gulizia again saw the same person walking by, going in the opposite direction, carrying a chrome box.

Gulizia put his dog out so it would bark if the person came back again. At about 2:30 or 3 a.m., alerted by the dog's barking, Gulizia noticed the same person walking by. He went outside and confronted the man. The man was squatting between a tool box and what appeared to be an ice chest. He told Gulizia his car had broken down, and he had been carrying his things to a friend's house. Gulizia again notified the sheriff's office, and gave them a description of the individual. At the preliminary hearing, Gulizia identified the defendant as the individual.

At 9 a.m. the same morning, Albert Quintara noted that his locked van had been broken into, and that several items were missing, including a smoke inhalator, a handgun and ammunition, a portable television-radio, a portable heater, and a tool box. A report was filed with the sheriff. Sergeant Robert Rutgers was assigned to investigate this theft.

On February 8, 1985, defendant accompanied his wife to the Santa Clara County Sheriff's office. His wife was there on a matter unrelated to this case. Sergeant Rutgers recognized defendant as matching the description of the person wanted in the Quintara theft. He told defendant he would like to talk to him, and defendant accompanied him into the interview room which was in the detective's bureau in an adjacent area in the building.

Sergeant Rutgers obtained defendant's drivers license and ran a check on it. He then advised defendant he was a suspect in relation to the Quintara theft, and his questions were in regard to that case. Defendant was asked if he knew anything about the theft and whether he had any of the stolen property. Although the record does not specifically reflect defendant's answers to these questions, Rutgers testified that defendant "did not deny" involvement in the theft.

Sergeant Rutgers then told defendant he wanted his cooperation one way or another. When defendant asked what he meant, the following discussion occurred.

"A.   I told him the investigation can proceed either the hard way or the easy way.

"Q.   And did you explain to him what the hard way and easy way was?

"A.   Yes, I did.

"Q. And what did you mean by that?

"A. Hard way was that he'd be taken in immediate custody, that he would be booked, that he would be placed in the main jail facility, that a lineup would proceed when I would bring witnesses in for personal identification and from there, upon identification, I would seek a search warrant in reference to obtaining property at 285 Staples where he resided with Wanda Sasser.

"The easy way was that I was seeking his cooperation, that although if he had admitted the crime that he was—would be detained for further questioning, however no arrest would take place until the D.A. re—viewed the case, and then in an effort to obtain the victim's property back and he wished to agree and assist in the investigation rather than go through booking procedures.

"Q. And what did you do then?

"A. I slightly discussed the case with him and advised him of his *Miranda*[1] rights."

At some point before he was *Mirandized,* defendant admitted the theft, although the record is not clear if it was before or after Sergeant Rutgers told appellant they could proceed "the easy or hard way."

At the preliminary hearing, Sergeant Rutgers also testified concerning this same conversation. ". . . I asked him, shall we do this interview the easy or the hard way? And he preferred the easy way. And I said, fine, then you wish to cooperate. He said yes. And you did a vehicle theft, got a gun and air-pack and tools. I want them back. He answered, are you arresting me? I said, no, not now if you can get the items back. He stated, let me see the list. He was reviewing the list which is the crime report by the victim. He stated I can get back all but the green tool box, but I'll try. I'm sure I can get it back. And I stated, now we're going to do it the right way. And he was read his Miranda rights and I received a second statement from him."

Sergeant Rutgers testified further: "Q. You gave him a choice of either cooperating with you, answering your questions and returning the property, or the alternative of being booked in the county jail at that time; is that right?

"A. That's correct.

---

[1]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

"Q. And then Mr. Celaya said that he would cooperate with you, and he would return the property; is that right?

"A. Yes, he did.

"Q. And it was after that conversation that you then read from the card the *Miranda* warning; is that right?

"A. In essence, yes."

Sergeant Rutgers then read defendant his *Miranda* rights. Defendant waived his rights, and said he wanted the interview to continue.

Sergeant utgers then took a statement from defendant wherein he admitted burglarizing the truck and said he still had the stolen items. Defendant agreed to work with Sergeant Rutgers to get the items back. Defendant agreed to return with the stolen items on the following Monday. He said he would not run. Sergeant Rutgers then permitted defendant to leave. Defendant neither returned to the sheriff's office on Monday, nor returned any of the stolen items.

Sergeant Rutgers testified defendant fit the description he had of the suspect (dark haired, dark eyes, 5 feet 6 inches to 5 feet 8 inches, 130-140 pounds, 30 years old, male-Mexican). Sergeant Rutgers also possessed information that a male Mexican had been seen at 285 Staples, where the occupants were otherwise known to be "Caucasians." Sergeant Rutgers also knew this residence was approximately three blocks from the victim's house.

From another case, Sergeant Rutgers knew that defendant's wife, Wanda Sasser, lived at 285 Staples. However, he did not know that they were husband and wife until after he questioned defendant. When defendant and Wanda Sasser came into the sheriff's office together, all the links were tied up.

The questioning took place in a room specifically used for police interviews. The room was away from the public area; other police officers were present nearby at the time of the interview.

Defendant contends the confession was elicited in violation of his *Miranda* rights. He maintains it was the result of a custodial interrogation, was coerced and therefore involuntary and was inextricably tied to the prior non-*Mirandized* interrogation and statement.

██ It is undisputed defendant made incriminating statements to Sergeant Rutgers before he was advised of his *Miranda* rights. The primary

issue before us therefore, is whether defendant was "in custody" when these initial statements were made. We recently discussed "custody" as it relates to the requirement of *Miranda* rights in *People* v. *Lopez* (1985) 163 Cal.App.3d 602 [209 Cal.Rptr. 575]. ■ There we said: " 'Custody has become the critical element which triggers the necessity for warning against incrimination, . . .' (*People* v. *Manis* (1969) 268 Cal.App.2d 653, 667 [74 Cal.Rptr. 423 ].) *Miranda* advisement is required prior to police interrogation 'after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' (*Miranda, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) [¶] While *Miranda* presented the clearest example of custody, namely the official isolation of a criminal suspect in a police station . . ., there is no doubt that *Miranda* applies 'to protect persons in all settings in which their freedom of action is curtailed in any significant way.' . . . [¶] A further aspect of 'custody' must be examined. Prior decisions have not been consistent in its application, but most have acknowledged an objective test of custody. *People* v. *Ceccone* (1968) 260 Cal.App.2d 886, 892 [67 Cal.Rptr. 499 ], stated that a person is in custody when: '[A]s a reasonable person he is led to believe that he is physically deprived of his freedom of action in any significant way.' (Accord, *People* v. *White* (1968) 69 Cal.2d 751, 760 [72 Cal.Rptr. 873, 446 P.2d 993]; *People* v. *Herdan* (1974) 42 Cal.App.3d 300, 306 [116 Cal.Rptr. 641 ]; *In re James M.* (1977) 72 Cal.App.3d 133, 136 [139 Cal.Rptr. 902 ]; *In re Pablo C.* (1982) 129 Cal.App.3d 984, 988-989 [181 Cal.Rptr. 468 ].) The United States Supreme Court has recently given unequivocal approval to the objective test of custody, stating: '[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. [Fn. omitted.]' (*Berkemer* [v. *McCarty* (1984)], *supra,* [468]U.S. [420, 442][82 L.Ed.2d 317, 336, 104 S.Ct. 3138, 3152].)" (*People* v. *Lopez, supra,* 163 Cal.App.3d 602, 605-606.)

The *Berkemer* court " 'decline[d] to accord talismanic power to the phrase in the *Miranda* opinion' (*ibid.*) which purported to require *Miranda* advice upon the deprivation of a suspect's freedom of action 'in any significant way.' (*Miranda, supra,* 304 U.S. at p. 444 [16 L.Ed.2d at p. 706].) Instead the court stated: 'Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.' (*Berkemer, supra* [468]U.S. at p. [437][82 L.Ed.2d at p. 333, 104 S. Ct. at p. 3149].)" (*People* v. *Lopez, supra,* 163 Cal.App.3d 602, 607.)

Since "[c]ustody is an objective condition. . . . [t]he subjective intent of the interrogator to arrest the suspect is not, *in itself* a sufficient basis upon which to conclude that custody exists." (*People* v. *Herdan* (1974) 42 Cal.App.3d 300, 306, [116 Cal.Rptr. 641], italics in original; fn. omitted.)

■ Since defendant herein was not under arrest prior to questioning, the issue narrows to whether he was "in custody" for *Miranda* purposes at the time of questioning. ■ "When an arrest has not yet taken place, the factors considered in deciding whether custody has attached are many. Among the most important are: (1) the site of the interrogation; (2) whether the investigation has focused on the suspect; (3) whether the objective indicia of arrest are present; and (4) the length and form of questioning." (*People* v. *Herdan, supra,* 42 Cal.App.3d 300, 306-307, fns. omitted.)

■ In our case, as in *Herdan,* we conclude defendant was deprived of his freedom in a significant way, and that the People failed to meet their burden of proof. First, the interrogation occurred in the inherently coercive environment of the police interview room. (*People* v. *Hill* (1969) 70 Cal.2d 678 [76 Cal.Rptr. 225, 452 P.2d 329].) While defendant was at the sheriff's office voluntarily, his purpose was to accompany his wife to the public area of the office on an unrelated matter. He agreed to go to the interview room for questioning only at the specific request of Sergeant Rutgers. Second, from the moment Sergeant Rutgers saw defendant with Wanda Sasser, he recognized him as the suspect; the investigation thereafter focused on defendant. Sergeant Rutgers testified "all the links were tied up." In addition, Sergeant Rutgers began the interview by telling defendant he was a suspect in the burglary. Third, the objective indicia of arrest appear to have been present. Defendant was asked accusatory type questions in an interview room. This, coupled with the discussion of proceeding either the easy or hard way evidences the presence of the indicia of arrest. "Furthermore, [defendant] could reasonably have believed that the indicia of arrest were present. . . . [¶] Finally, [the nature of the questioning was not neutral but clearly] intended to elicit an incriminating admission. It was highly accusatorial in nature. [¶] These factors, we believe, indicate that appellant was in custody at the time of the [questioning and] that he was not free to leave . . . ." (*People* v. *Herdan, supra,* 42 Cal.App.3d 300, 308.)

The instant case is similar to the facts in *People* v. *White, supra,* 69 Cal.2d 751 , where our Supreme Court held that *Miranda* warnings *were* required. "There, the suspect voluntarily accompanied officers to the police station for questioning regarding a murder. [Fn. omitted.] Once there, the investigating officer came upon independent information which focused suspicion on the suspect." (*People* v. *Herdan, supra,* 42 Cal.App.3d at p. 308.) The officer there asked the suspect "only one question, namely, whether a particular coat involved in the crime belonged to him. The suspect said that it did not. The suspect then put on the coat at the officer's request [fn. omitted] and when the officer commented that it fit him well, the suspect blurted out a confession. The court, noting that the investigation had focused on the suspect, that the officer did not intend to let the suspect go until the questioning was

over, and that the officer's comments were accusatorial in nature, held that custody existed. (Citation.)" (*Id.* at pp. 308-309.)

Having concluded defendant was "in custody" at the time of the initial statement, it is clear the statement is not admissible since it was obtained in violation of defendant's *Miranda* rights. Immediately following this non-*Mirandized* admission, however, defendant was read and waived his *Miranda* rights. He thereafter gave a confession which was substantially similar to the prior admission. We must therefore determine the effect the prior non-*Mirandized* statement had upon the subsequent *Mirandized* confession.

The People contend the adoption of article I, section 28, subdivision (d), of the California Constitution has substituted the federal standard of admissibility for that previously developed by the California Supreme Court. We conclude the confession is inadmissible under either standard.

█ Under California law a non-*Mirandized* confession is presumed to taint a later *Mirandized* confession. (*In re Pablo C.* (1982) 129 Cal.App.3d 984 [181 Cal.Rptr. 468].)

In *Pablo C.*, a highway patrolman was investigating incidents of rock throwing from a freeway overpass. He detained two juveniles, one of whom was Pablo. Police arrived shortly thereafter. One of the officers took Pablo aside and asked him if he was involved in the rock throwing. Pablo admitted responsibility and the officer then read Pablo his *Miranda* rights. Pablo again acknowledged his responsibility. Two days later when he was questioned by a different officer at his school after receiving his *Miranda* rights Pablo again confessed.

The court ruled that the second admission at the scene and the third confession at the school were tainted by the initial confession, obtained without *Miranda* warnings. (*Id.* at p. 990.)

The court found nothing coercive about the first statement; the court ruled only that the minor should have been read his *Miranda* rights before being questioned initially. "As a general rule where an accused makes one confession and at a later time again confesses, it is presumed the second confession is a product of the first." (*Id.* at p. 989.)

Under federal law a suspect who has responded to uncoerced questioning without having been given *Miranda* warnings may waive his rights and confess after he has been given the requisite *Miranda* warnings. The subsequent warned statement is deemed not tainted by the uncoerced, unwarned

statement. (*Oregon* v. *Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222, 105 S.Ct. 1285].) The court there held the circumstances "had none of the earmarks of coercion . . . [n]or did the officers exploit the unwarned admission to pressure respondent into waiving his right to remain silent." (*Id.* at p. 316 [84 L.Ed.2d at p. 236].) The *Elstad* court limited its holding to the failure to administer *Miranda* warnings "unaccompanied by an actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will. . . ." (*Id.* at p. 309 [84 L.Ed.2d at p. 232].)

■ In the instant matter, the second statement unquestionably flowed from and was inextricably connected with the first statement. The statements were part of a continuous interrogation occurring at the same location, conducted by the same officer, and uninterrupted in time. Immediately before receiving his *Miranda* advisements, defendant admitted responsibility for the crimes and discussed some of the details. The first statement followed the officer's threat to immediately arrest defendant if he failed to cooperate. It was only then that the defendant, after incriminating himself, and being told by Sergeant Rutgers, "now we're going to do it the right way," was advised of his *Miranda* rights.

We find therefore, defendant's post-*Miranda* confession was the product of this earlier statement obtained sans warning and was improperly admitted. ■ The improper introduction in evidence of a confession is reversible error per se. (*People* v. *Disbrow* (1976) 16 Cal.3d 101, 115-116 [127 Cal.Rptr. 360, 545 P.2d 272].)

The judgment is reversed.

Agliano, P. J., concurred.

**BRAUER, J.,** Concurring—I agree with the holding that defendant's first admission was made in a custodial setting and was therefore inadmissible. I believe, as does the majority, that his subsequent post-*Miranda* statement was inextricably tied to the first one and was given under circumstances replete with earmarks of coercion so as to be inadmissible even under *Oregon* v. *Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222, 105 S.Ct. 1285].

But I cannot join in the discussion of the difference between a federal and California standard, here the alleged presumption of taint. I readily concede that the California Supreme Court is the ultimate interpreter of the California Constitution. No one has put it more clearly than Mr. Justice Cardozo: "A judgment by the higest court of a state as to the meaning and effect of its own constitution is decisive and controlling everywhere." (*Highland Farms Dairy* v. *Agnew* (1937) 300 U.S. 608, 613 [81 L.Ed. 835, 840, 57 S.Ct.

549].) But while I do not challenge the power, I question the manner of its exercise in the last 15 years.

Intent upon shedding the obligation to follow unpalatable constitutional doctrine, the California Supreme Court has endeavored to infuse different meaning into language of the California Constitution which is essentially identical to that of its federal counterpart.[1] In *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], the decision which outlawed the death penalty, the court labored mightily and brought forth[2] the fact that the delegates to the constitutional convention adopted the "cruel or unusual punishment" language from the North Carolina Constitution rather than the "cruel and unusual" words contained in the Iowa and United States Constitutions, and that such choice was purposeful. Purposeful, perhaps, but to what purpose? No evidence was cited in *Anderson,* none has ever been cited, none can be cited, that the delegates by that choice, or the People in adopting the California Constitution and its amendments, intended to accord to lawbreakers any greater immunity from being held accountable than is vouchsafed them by the United States Constitution. If there ever was doubt on that subject, it was dispelled by Proposition 8.[3]

In *People* v. *May* (Cal.), the California Supreme Court again reaffirmed an exclusionary rule applicable to defendants' statements, broader than one permissible under federal precedents. Rehearing has been granted in that case.[4] Our High Court now has an opportunity to take another look at "the newly discovered separate and independent state constitutional interpretations."[5] I respectfully suggest that if such scrutiny is undertaken, the "independent state ground" doctrine will be revealed to rest on a historical foundation of sand.

[1]See Clark, J., dissenting in *People* v. *Norman* (1975) 14 Cal.3d 929, 940 [123 Cal.Rptr. 109, 538 P.2d 237].

[2]"The mountains will be in labor, and a mouse will be brought forth." (Horace, Epistles, Ars Poetica, line 139.)

[3]California Constitution, article I, section 28, subdivision (d); *In re Lance W.* (1985) 37 Cal.3d 873, 879, 889, 890 [210 Cal.Rptr. 631, 694 P.2d 744].

[4]Minutes of the Supreme Court, March 26, 1987 (Crim. 24991).

[5]Richardson, J. dissenting in *People* v. *Disbrow* (1976) 16 Cal.3d 101, 120 [127 Cal.Rptr. 360, 545 P.2d 272].