[No. H001417. Sixth Dist. Apr. 5, 1988.]

SAN JOSE POLICE OFFICERS ASSOCIATION et al., Plaintiffs and Appellants, v.
CITY OF SAN JOSE et al., Defendants and Respondents.

COUNSEL

Ronald Yank, Peter D. Nussbaum, Roland M. Katz and Neyhart, Anderson, Nussbaum, Reilly & Freitas for Plaintiffs and Appellants.

Joan R. Gallo, City Attorney, and Andrea Bryan Ferguson, Deputy City Attorney, for Defendants and Respondents.

OPINION

**AGLIANO, P. J.**—Penal Code section 12027, subdivision (a), exempts certain honorably retired peace officers from criminal prohibitions against carrying concealed firearms. (Pen. Code, §§ 12027, subd. (a), 12050.) Section 12027 also provided that "[t]he agency from which a peace officer is honorably retired may . . . deny or revoke, for good cause, the retired officer's privilege to carry a weapon as provided in this subdivision."[1]

Pursuant to this statute, the Chief of Police of the City of San Jose, respondent Joseph D. McNamara, denied appellant Norvel Pulliam the privilege to carry a concealed weapon. At a hearing conducted by the chief's designee, Pulliam unsuccessfully challenged the denial. Following the hearing, Pulliam and the San Jose Police Officer's Association (SJPOA) petitioned the superior court for a writ of mandate commanding the City of San Jose to provide Pulliam and other retired officers with additional procedural protections before denying concealed weapons privileges under section 12027. Pulliam and SJPOA also asked the court to find that section 12027

---

[1] Section 12027 was amended in 1987 in ways that do not affect this case.

conferred the power to deny only upon the city and not its chief of police. The superior court declined to grant relief.

On appeal, Pulliam and the SJPOA (collectively "appellants") renew the contentions they made below: (1) that the chief of police had no authority under Penal Code section 12027; and (2) that the California Constitution's due process clause requires additional procedural protections. We hold that the chief of police does have authority to make the determination called for under section 12027 and that the California Constitution does not require procedural protections in addition to those already afforded. Thus, we affirm.

## I. FACTS

Appellant Pulliam joined the San Jose Police Department in 1958. He retired, on account of a service-connected disability, with the rank of lieutenant on February 7, 1984.

Most of the facts relevant to the existence of "good cause" to deny a concealed weapons certificate emerged at a meeting of the Board of Administration of the Police and Fire Department Retirement Plan. At the meeting, the board granted Pulliam's request for service-connected disability retirement. The essential basis for Pulliam's request was that he could no longer perform his duties because of stress.[2] Seven physicians submitted medical reports in connection with Pulliam's request. Of the seven, it appears that only the city medical director recommended that Pulliam's request not be granted.

According to the minutes, Pulliam's attorney explained the causes of Pulliam's stress as follows: "Mr. Pulliam has made unsuccessful requests for transfer, [and] has received disciplinary suspensions . . . . [Counsel] said that Mr. Pulliam is out of tune with the present administration, which is causing friction, although he is a good traditional law enforcement officer. [Counsel] said that the evidence indicates that Mr. Pulliam was a dedicated employee who has given over 25 years of service, that he does have problems in that he has been the recipient of a great deal of stress over the past two years, and that he is presently incapable of doing his normal and ordinary job . . . ." Pulliam's attorney also stated that "Pulliam's own perception that he has been treated unfairly has caused him to have an increase in symptoms related to stress, and he has come to the point emotionally where he cannot do his job."

---

[2] Pulliam's request for a service-connected disability was also based on hypertension and sensitivity to smoke.

On February 27, 1984, about three weeks after the hearing before the retirement board, the police chief conducted a hearing on Pulliam's request for a concealed weapons certificate. Deputy Chief Fred Abram, whom the chief had designated as his representative, attended. Also in attendance were Pulliam, his attorney, an attorney from the city attorney's office, and another representative of the police department. At the hearing, Pulliam's attorney challenged the chief's decision and presented additional evidence to support his request for a license.[3] In general, however, the hearing appears to have consisted of legal arguments between Pulliam's representatives and an assistant city attorney, about what additional procedural safeguards, if any, should be provided.

Pulliam's challenge to the chief's decision was not successful. The chief explained his basis for his action in a declaration submitted to the superior court in the mandamus action. The chief stated: "I denied . . . Pulliam's privilege to carry a concealed weapon pursuant to Penal Code [section 12027, subdivision (a)]. This denial was based on my own evaluation as well as staff recommendations regarding evidence considered by the Police and Fire Retirement Board hearing held on February 7, 1984. . . . [¶] [A] review of these medical and psychiatric records revealed that . . . Pulliam had difficulty in dealing with stressful situations and was a high risk for suicide. I felt that this constituted 'good cause' within the meaning of [section 12027]."

## II. Discussion

On appeal, appellants stress that Pulliam's "fitness to carry a concealed weapon is not before the Court."[4] "Rather," as appellants correctly observe, "the only questions raised by the appeal are: (1) whether respondent McNamara had the power under [Penal Code section 12027, subdivision (a)], to decide whether Mr. Pulliam could carry a concealed weapon permit, and (2) whether respondent City and/or McNamara denied appellant the procedural protections to which he is entitled under the due process [clause] of the California Constitution."

### A. The Police Chief's Authority

■ Appellants argue that only the San Jose City Council had authority under Penal Code section 12027 to deny Pulliam a concealed weapons

---

[3] The evidence consisted of a letter from the physician who had recommended against granting a service-connected disability. In his letter, the physician stated that Pulliam "is basically in good health . . . and has no emotional or psychological problems which would prohibit him from carrying a weapon."

[4] Appellants have not placed the relevant medical reports in the record.

certificate and that, as a result, the police chief's purported denial is not effective. We disagree with appellants' interpretation of the statute.

Penal Code section 12027, subdivision (a), provides that: "[t]he *agency* from which a peace officer is honorably retired may, upon initial retirement of the peace officer, or at anytime subsequent thereto, deny or revoke, for good cause, the retired officer's privilege to carry a weapon as provided in this subdivision." (Italics added.) Appellants argue that the police department is not an "agency" because it has no existence independent of the city. Thus, the argument continues, the agency from which Pulliam retired was the city, itself, and the city charter vests in the city council "[a]ll powers of the City."

The problem with this argument is that there is no reason to believe that the term "agency" in section 12027 has the technical meaning that appellants ascribe to it. In support of their argument, appellants cite opinions of the Attorney General interpreting the more specific term "[p]ublic agency" as used in Government Code section 20009 to determine eligibility for participation in the Public Employees' Retirement System. (3 Ops.Cal.Atty. Gen. 234 (1944); 45 Ops.Cal.Atty.Gen. 82 (1965).) These interpretations of a different term in a different context do not control the interpretation of Penal Code section 12027. Indeed, if the statutory definition of "public agency" has any bearing on the issues in this case, it is to suggest that the more general term "agency" found in Penal Code section 12027 has a different meaning.

A more fundamental problem with appellants' argument is that there is absolutely no reason to think that it would contravene legislative intent to allow the chief of a municipal police department to determine whether retired officers should be allowed to carry concealed weapons. In fact, the Legislature expressly gave municipal police chiefs authority to grant or deny applications for concealed weapons licenses filed by other persons.[5] (Pen. Code, § 12050, subd. (a).) The Legislature also gave municipal police chiefs authority to permit peace officers from other California jurisdictions to act as peace officers within the chief's municipality (Pen. Code, § 830.1, subd. (a)(2)) and, by necessary statutory implication, to carry concealed weapons while so acting. (Pen. Code, § 12027, subd. (a).) Finally, as the

---

[5] Penal Code section 12050, subdivision (a), provides: "The sheriff of a county or the chief or other head of a municipal police department of any city or city and county, upon proof that the person applying is of good moral character, that good cause exists for the issuance, and that the person applying is a resident of the county, may issue to such person a license to carry concealed a pistol, revolver, or other firearm for any period of time not to exceed one year from the date of the license, or in the case of a peace officer appointed pursuant to Section 830.6, three years from the date of the license."

head of the law enforcement agency that trained, supervised, and evaluated the officer in question before retirement, a chief of police has superior access to the information upon which the decision under section 12027 usually will be based.

Because we do not find support for appellants' restrictive interpretation of the term "agency," because there is no evidence that it would contravene legislative intent for municipal police chiefs to act under Penal Code section 12027, and because the Legislature has expressly authorized municipal police chiefs to make similar determinations, we hold that the Chief of Police of the City of San Jose had authority to act under section 12027.[6]

### B. *Due Process*

Appellants have based their claim to additional procedural protections solely on the California Constitution. Indeed, it is doubtful whether appellants would have a due process claim under the federal Constitution. The Ninth Circuit has determined that the denial of a concealed weapons certificate under Penal Code section 12027 does not raise due process concerns.[7] In *Ass'n of Orange County Deputy Sheriffs* v. *Gates* (9th Cir. 1983) 716 F.2d 733, the court held that "the [statutory] requirement of 'good cause' prior to the denial of a weapons certificate does not create a constitutionally protected interest, because it is not a 'significant substantive restriction on the basis for [the] agency's action.' " (*Id.,* at p. 734, quoting *Jacobson* v. *Hannifin* (9th Cir. 1980) 627 F.2d 177, 180.)

As appellants correctly observe, however, the California Constitution's due process clause protects a broader range of interests than the federal Constitution's due process clause. The difference between California and federal law stems from *People* v. *Ramirez* (1979) 25 Cal.3d 260, 263-264 [158 Cal.Rptr. 316, 599 P.2d 622] (hereinafter *Ramirez*). Under *Ramirez,* "when a person is deprived of a statutorily conferred benefit, due process analysis must start not with a judicial attempt to decide whether the statute has created an 'entitlement' that can be defined as 'liberty' or 'property,' but

---

[6] Appellants have included in the record a resolution in which the San Jose City Council designates the chief of police "to establish procedures and conduct hearings to grant, deny, suspend or revoke carrying concealed weapons authorization to retired San Jose Peace Officers." The resolution, dated June 26, 1984, apparently came four months after the events relevant to this case. In light of our interpretation of Penal Code section 12027, subdivision (a), we do not rely upon the resolution.

[7] The Ninth Circuit has also held that licensed private investigators and their employees do not have liberty or property interests in receiving concealed weapon permits under Penal Code section 12050. (*Guillory* v. *County of Orange* (9th Cir. 1984) 731 F.2d 1379, 1382-1383; *Erdelyi* v. *O'Brien* (9th Cir. 1982) 680 F.2d 61, 63-64.)

with an assessment of what procedural protections are constitutionally required in light of the governmental and private interests at stake." (*Id.,* at p. 264.)

Because section 12027 confers a benefit upon retired peace officers, we assume that the statute triggers procedural due process under the California Constitution and that *Ramirez* requires an analysis of what procedure is due. However, *Ramirez* does not purport to require any particular level of procedural safeguards in any particular case. Instead, "[i]n determining applicable due process safeguards, it must be remembered that 'due process is flexible and calls for such procedural protections as the particular situation demands.' " (*People* v. *Ramirez, supra,* 25 Cal.3d at p. 268, quoting *Morrissey* v. *Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593].) In other words, the level of procedural protection varies with the interests at stake, considered according to the balancing formula set out in *Ramirez*. In some instances, the interests at stake "may counsel formal hearing procedures that include the rights of confrontation and cross-examination, as well as a limited right to an attorney." (*Id.* at p. 269.) "In others, due process may require only that the administrative agency comply with the statutory limitations on its authority." (*Id.* at p. 269.)

Initially, we identify the procedural protections that already exist. First, Penal Code section 12027 expressly requires the chief's decision to be based on good cause. (Pen. Code, § 12027, subd. (a).) Second, the police chief has stated that his policy is to "review each application on a case-by-case basis." This policy of case-by-case determinations is consistent with *Salute* v. *Pitchess* (1976) 61 Cal.App.3d 557 [132 Cal.Rptr. 345], in which the court required case-by-case determination of applications to a police chief for concealed weapons licenses pursuant to Penal Code section 12050. Third, the chief has also stated that it is his policy "to view all available medical and psychiatric evidence, review staff recommendations, if any, and to provide the opportunity for a hearing on any denial before myself or a designated representative."

To determine whether these safeguards comport with due process, we follow the analysis set out in *Ramirez*. ■ "[I]dentification of the dictates of due process generally requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental

interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*People* v. *Ramirez, supra,* 25 Cal.3d at p. 269.)

1. *The Private Interest That Will Be Affected by the Official Action.*

Nowhere in the record have appellants discussed Pulliam's individual reasons for wanting to carry a concealed weapon. However, we do not conclude on that basis that he has no interest in carrying one; even less do we conclude that other police officers have no such interest. Still, appellants' silence on this point compels us to address the private interests at stake in a rather more general way.

Appellants seek to demonstrate that all retired officers need concealed weapons with the following argument: "Because of their prior police work, retired peace officers, such as Pulliam, face a greater threat to their personal safety than does the average citizen. The Legislature was legitimately concerned that dangerous persons [whom] peace officers arrested or confronted during their careers might later seek revenge against them. Accordingly, the Legislature allowed retired peace officers to carry concealed weapons in order to protect themselves. Denying Pulliam the right to carry such a weapon has an adverse effect upon his ability to protect himself from physical harm, and, therefore, constitutes a serious infringement of his private interest."

Unfortunately, appellants cannot offer any support for their assertions about the legislative intent. Acknowledging this, appellants argue that "[t]here is no other plausible explanation for allowing retired police officers to carry concealed weapons since they no longer have peace officer status and therefore are not involved in law enforcement."

Rather than speculating about whether all retired officers need concealed weapons, it is more reasonable to acknowledge the obvious: in different cases different reasons will speak for or against the privilege. The unelaborated statutory requirement of "good cause" permits—indeed invites—the police chief to take different reasons into account and to balance the considerations for and against. In one hypothetical case, as appellants suggest, a concealed weapon might well be necessary for defense against criminals seeking revenge against the former police officer who apprehended them. Even in such a case, however, psychological or other relevant problems might suggest that it would be unwise to give the officer in question the responsibility of a concealed weapon. In another case, a retired officer might face nothing more than the ordinary personal dangers of urban life. Yet, if

the officer in question had an exemplary record of thorough weapons training and careful use, the police chief might well conclude that good cause did not exist to deny a certificate.

■ In short, the "good cause" requirement contemplates flexibility; there is no factual or statutory basis for assuming that every former police officer needs a weapon for continuing protection against personal assaults.

Appellants also argue that the denial of a concealed weapons certificate imposes a derogatory stigma. The principle that appellants invoke is an important one. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." (*Wisconsin* v. *Constantineau* (1971) 400 U.S. 433, 437 [27 L.Ed.2d 515, 519, 91 S.Ct. 507].)

In this case, however, the denial of a concealed weapons permit was not accompanied by a stigma; the chief simply denied the permit. In the ensuing litigation the chief stated that he believed Pulliam "had difficulty in dealing with stressful situations and was a high risk for suicide." However, Pulliam cannot use the litigation to create a stigma where none existed and then use that as a basis for a due process challenge.

There might also be a stigma if section 12027 required the denial of a certificate to be based on the existence of a fact which impugned the retired officer's good name, reputation, honor, or integrity. However, there is no authority for reading such a requirement into Penal Code section 12027. Because the need for a concealed weapon does not inevitably follow from a police officer's prior service, relatively slight factors may tilt the balance in favor of finding good cause to deny.

*2. The Risk of an Erroneous Deprivation of Such Interest Through the Procedures Used, and the Probable Value, If Any, of Additional or Substitute Procedural Safeguards.*

■ In their petition for a writ of mandate, appellants requested a "full evidentiary hearing" with an array of procedural safeguards borrowed from the model of adversarial proceedings.[8] Such procedures, however, do not necessarily enhance the reliability of subjective, evaluative determinations.

---

[8] In their petition to the superior court, appellants asked for a writ commanding the city to provide the following procedural safeguards for Pulliam and all other retired officers: "(a) Provide [Pulliam] with a written statement stating, in clear and concise terms, the reasons the [chief] has denied him his right to carry a concealed weapon. [¶] (b) Provide [Pulliam] with a full evidentiary hearing, before a trained neutral third party, who shall be mutually selected

The Supreme Court in *Ramirez* specifically discussed this subject. The "statutory benefit" at issue in *Ramirez* was a prisoner's interest in confinement and treatment for drug addiction at the California Rehabilitation Center (CRC) instead of confinement in state prison. (*People* v. *Ramirez, supra,* 25 Cal.3d at p. 264.) The relevant statutes authorized the Director of CRC to determine initially whether a prisoner, " 'because of *excessive criminality* or for other *relevant reason,* is not a fit subject for confinement or treatment . . . .' " (*People* v. *Ramirez, supra,* 25 Cal.3d at p. 266, quoting from Welf. & Inst. Code, § 3053.)

Discussing the question of what procedural protections are appropriate, the *Ramirez* court stated: "A more difficult question is whether confrontation, cross-examination, and other formal hearing rights must be provided. The principal value fostered by such rights in these circumstances is that of promoting accuracy and reliability in governmental decisionmaking. . . . [T]he Director's decision is evaluative in nature and based on his specialized subjective judgment; that judgment depends on consideration of a host of intangible factors rather than on the existence of particular and contestable facts. As a result, more formal procedures than those previously identified would not reduce the likelihood of an erroneous determination, unless the individual challenging the decision could confront and cross-examine all the experts and persons who contributed information to his case history and to his psychiatric reports and criminal record. Even then, the marginal value to the individual would seem to be relatively insignificant because of the difficulties inherent in challenging the subjective aspects of an evaluative-type decision. Moreover, such extensive procedures would substantially impair administrative efficiency." (*People* v. *Ramirez, supra,* 25 Cal.3d at pp. 275-276.)

This discussion points out the problems with imposing additional procedural safeguards on inherently subjective, evaluative judgments. The "good cause" determination required by Penal Code section 12027 falls into the same category. In some respects, the "good cause" determination is analogous to the decision whether to assign an active officer to a position entailing the use of weapons.[9] In both cases, the critical step is the decisionmaker's subjective evaluation of the officer's ability to make quick, responsi-

---

by [petitioners] and the [city]. The neutral third party shall determine whether the [city] has cause to deny [Pulliam] his right to carry a concealed weapon. The [city] shall have the burden of proof to establish cause. The neutral party's decision shall be binding upon the parties."

[9] Police departments may reassign officers to positions that do not involve the use of firearms (*Stuessel* v. *City of Glendale* (1983) 141 Cal.App.3d 1047 [190 Cal.Rptr. 773]) and restrict police officers' use of firearms (*Long Beach Police Officers Assn.* v. *City of Long Beach* (1976) 61 Cal.App.3d 364 [132 Cal.Rptr. 348]).

ble decisions about the use of lethal force. Since the police chief has superior access to information about the retired officer's training and performance, as well as experience in making similar determinations under other statutes (cf. Pen. Code, § 12050), we cannot say that additional procedures drawn from the model of adversarial proceedings would lead to a more accurate determination of "good cause."

The facts of this case do not compel a different conclusion. Arguing to the contrary, appellants observe that the chief did not provide a written notice which included a statement of the grounds for his decision. On that basis, appellants argue that Pulliam was unable to confront the evidence against him, was unable to make a meaningful response, and that as a result the hearing was "meaningless." Appellants also claim that Pulliam did not have access to the information on which the chief based his decision. The record does not support these arguments.

The chief's action was based on the same evidence that supported Pulliam's request for a service-connected disability retirement. At the retirement board's meeting, Pulliam and his counsel relied on the medical reports to demonstrate that Pulliam was unable to perform his duties because of stress. There is no doubt that Pulliam and his attorney were familiar with the reports, and there is no claim to the contrary. Indeed, Pulliam's attorney discussed the contents of the medical reports at the board meeting.[10] Moreover, Pulliam and his counsel obviously were aware that the medical evaluations would bear on his request for a concealed weapons permit. Pulliam's counsel came to the hearing prepared with additional evidence in the form of a letter from the one physician who had recommended against granting a service-connected disability retirement. Since Pulliam did know the basis for the chief's action and did have access to the relevant information, to require further proceedings in this case would not give Pulliam any advantage in challenging the decision.[11]

---

[10] If there were still any doubt that Pulliam and his counsel were familiar with the medical reports' contents, the retirement board's minutes reflect that the reports were read for the record and both Pulliam and his counsel were present. The record does not reflect whether Pulliam himself solicited the reports favorable to his position.

[11] Appellants also argue that due process in this case required a neutral decisionmaker. For two reasons, this argument does not justify us in disturbing the decision. First, although it is true that courts have required neutral decisionmakers in cases involving criminal and disciplinary sanctions (see, e.g., *Withrow* v. *Larkin* (1975) 421 U.S. 35, 47 [43 L.Ed.2d 712, 732, 95 S.Ct. 1456] (administrative hearing to determine existence of cause to revoke physician's license and refer matter to district attorney for commencement of criminal action); *In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 946, 75 S.Ct. 623] (judge may not act as "one-man grand jury" and trial judge in the same case); cf. *Applebaum* v. *Board of Directors* (1980) 104 Cal.App.3d 648, 657 [163 Cal.Rptr. 831] (revocation by private hospital board of physician's obstetrical staff privileges for improper conduct)), appellant has not cited any

3. *The Dignitary Interest in Informing Individuals of the Nature, Grounds and Consequences of the Action and in Enabling Them to Present Their Side of the Story Before a Responsible Public Official.*

The *Ramirez* court's identification of a substantive "dignitary" interest— "an individual's due process liberty interest in freedom from arbitrary adjudicative procedures"—further differentiates California from federal law in the area of due process. (*People* v. *Ramirez, supra,* 25 Cal.3d at p. 264.) The effect of adding the "dignitary" interest to the due process analysis is that, "even in cases in which the decisionmaking procedure will not alter the outcome of governmental action, due process may nevertheless require that certain procedural protections be granted the individual in order to protect important dignitary values . . . ." (*Id.,* at p. 268.)

It is equally important to stress, however, that the *Ramirez* dignitary interest does not compel trial-like, adversarial procedures in every case. Although such procedures may be required in some cases, the *Ramirez* court made it clear that, "[i]n others, due process may require only that the administrative agency comply with the statutory limitations on its authority." (*Id.,* at p. 269.) In determining the level of procedural protection required, the dignitary interest is a necessary factor—but only one among several—in the total analysis. (*Ibid.*)

The court in *Ramirez* required the Director of CRC to provide an excluded prisoner with a "right to respond orally before a responsible official if he so chooses." (25 Cal.3d at p. 275.) The court stated that "[s]uch oral participation may be useful in resolving conflicting information and in the introduction of subjective factors into the decision-making process that might otherwise not be considered; it thereby may often tend to enhance the accuracy and reliability of the exclusion decision." (*Ibid.*) The court also observed, with more specific reference to dignitary concerns, that " '[o]nly through [oral] participation can the individual gain a meaningful understanding of what is happening to [him], and why it is happening. Moreover, providing the opportunity to react—to register concern, dissatisfaction, and even frustration and despair—is the best method to promote the feeling that, notwithstanding the substantive result, one has been treated humanely

---

case imposing such a requirement on the type of subjective, evaluative decision involved in this case. The Court in *Ramirez* did not impose such a requirement.

Second, and more important, there is absolutely no factual basis for the appellants' argument. Not arguing to the contrary, appellants are prepared only to suggest that "the Chief *might* have been biased" and that "[t]he Chief and Pulliam had an employer-employee relationship," which "is an adversarial one which has a *potential* for disagreement, displeasure and dislike." (Italics added.)

and with dignity by one's government.'" (*Ibid.*, quoting from Saphire, *Specifying Due Process Values: Toward a More Responsive Approach to Procedural Protection* (1978) 127 U.Pa.L.Rev. 111, 164-165, fn. omitted.)

Pulliam had such an opportunity in this case. Although the police chief did not provide a hearing of the adversarial formality that appellants desire, Pulliam had an opportunity to ask questions, to state his own views, to offer additional evidence, and to attempt to change the decisionmaker's mind. Thus, respondents have sufficiently accommodated appellants' dignitary interest in participating in the chief's determination of "good cause" under Penal Code section 12027.

4. *The Governmental Interest, Including the Function Involved and the Fiscal and Administrative Burdens That the Additional or Substitute Procedural Requirements Would Entail.*

The most important governmental interest at stake in determinations under Penal Code section 12027 is the interest in controlling concealed weapons. The overwhelming importance of this interest is demonstrated by the Legislature's imposition of serious criminal sanctions on the unlicensed possession of concealed weapons.[12] (E.g., Pen. Code, § 12025.) Appellants acknowledge that this interest "is an important one" and that "[t]he City should be concerned about anyone, including retired peace officers, who is allowed to carry a concealed weapon."

There is no question that the procedures appellants request would entail additional fiscal and administrative burdens. Appellants argue that additional procedures "would not be unduly burdensome as they require the City to do no more than it now does in personnel matters." Appellants state that "[t]he City is presently required by its Civil Service Rules . . . and the Memorandum of Understanding between the City and the [Association][13] to provide a police officer with written notice of its intent to discipline him and

---

[12] The Supreme Court's opinion in *CBS, Inc.* v. *Block* (1986) 42 Cal.3d 646 [230 Cal.Rptr. 362, 725 P.2d 470], also suggests the unusual importance of this interest. In *CBS,* the court opened to public inspection the names and applications of persons to whom the Sheriff of Los Angeles County had granted concealed weapons licenses under Penal Code section 12050. (42 Cal.3d at p. 654.) The court believed that the privilege of carrying a concealed weapon was so extraordinary that the public interest in scrutinizing its grant outweighed the privacy rights of the 35 license holders, who had expressed concern for their personal safety. (*Ibid.*; see also p. 657 (Mosk, J., dissenting).)

[13] Appellants describe the memorandum of understanding as "the parties' collective bargaining agreement." No party contends that the memorandum of understanding, or the civil service rules, dispose of the issues before us.

the opportunity to respond *before* discipline is imposed. The Rules and the MOU also grant the officer an evidentiary hearing before a neutral third party who is empowered to issue a final and binding decision. . . . The City cannot dismiss an officer, no matter how unfit for service it considers him, until these procedures have been complied with fully. Requiring the City to follow similar procedures before revoking or denying an honorably retired peace officer's identification certificate would not impose an undue burden."

Appellants' argument is not persuasive. That the city has agreed with its police officers' exclusive bargaining representative to follow certain procedures in areas subject to collective bargaining does not usefully direct our consideration of the issue presented under Penal Code section 12027. Indeed, if the structure of contractual disciplinary procedures had any influence on the *Ramirez* balance, it would be to suggest that the police department's existing administrative burdens counsel against adding more. Moreover, we reject absolutely appellants' suggestion that the denial of a concealed weapons certificate is a form of disciplinary action; it is, instead, a highly subjective evaluation of an individual's need for and capacity for handling concealed weapons.

 In summary, the factors set out in *Ramirez* do not counsel the imposition of procedural requirements in addition to those the chief of police already follows in determinations under Penal Code section 12027. First, the private interest of retired officers in obtaining concealed weapons certificates varies from case to case; we cannot assume that the need for a certificate automatically follows from past service. Second, the risk of an erroneous determination inherent in this subjective decision is not likely to be reduced by the procedures that appellants request. Third, the oral hearing afforded in this case provided an occasion for Pulliam to protect his dignitary interest by asking questions, stating his own views, offering additional evidence, and attempting to change the decisionmaker's mind. Finally, in light of these factors, there is not a sufficient justification for imposing additional administrative burdens.

### III. DISPOSITION

The judgment is affirmed. In view of our decision to affirm, there is no need to address appellants' request for attorneys' fees.

Capaccioli, J., concurred.

**BRAUER, J.,** Concurring.—I join in the holding. But while I am of course bound by *People* v. *Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599

P.2d 622], I must cry out in protest whenever occasion arises against the "separate state ground" doctrine, the endeavor of the California Supreme Court to infuse different meaning into language of the California Constitution which is essentially identical to that of its federal counterpart,[1] and thereby to accord certain Californians greater rights and others correspondingly less protection[2] than are guaranteed by the United States Constitution.

In *People* v. *Ramirez, supra,* 25 Cal.3d 260, our Supreme Court did not even make an effort to base its interpretation of the state due process clause on an expression or other evidence of intent on the part of the enactors. Such effort would have been unavailing. No persuasive evidence has ever been cited and none can be cited that the delegates drafting the clause or the People in adopting it intended it to have different significance or impact from its federal model.[3]

It is ironic that in the early 1950's, my generation of idealistic law students and our professors took every opportunity to urge upon the high court that it interpret the Fourteenth Amendment so as to encompass the Bill of Rights, thus assuring each person in the land, whether he live in Massachusetts or Mississippi, the same fundamental rights. Our hopes were realized in essentials.[4]

But by the 1970's, some state courts had grown restive at what they viewed as the slow pace of change coming down. And so they discovered their state constitutions. It was a marvelous idea: Here was an avenue for

---

[1] United States Constitution, Amendment XIV, section 1: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; . . . ." California Constitution, Article I, section 7(a): "A person may not be deprived of life, liberty, or property without due process of law . . . ." Article I, section 15: "Persons may not . . . be deprived of life, liberty or property without due process of law."

[2] At issue here is the right of a person who was retired from police work for inability to cope with stress to carry a concealed weapon.
 The thesis that additional rights granted to one person are not fashioned out of thin air but are purchased at the expense of other persons and values was compellingly argued by Justice Macklin Fleming in The Price of Perfect Justice (Basic Books, Inc. 1974). See especially part I, chapter 1: The Ideal of Perfectibility.

[3] In *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] the California Supreme Court made an effort to find historical evidence for distinguishing the "cruel and/or unusual punishment" clauses of the federal and California Constitutions. It did not succeed. (See Brauer, J., concurring in *People* v. *Celaya* (1987) 191 Cal.App.3d 665, 674-675 [236 Cal.Rptr. 489].)

[4] See e.g., *Wolf* v. *Colorado* (1949) 338 U.S. 25 [93 L.Ed. 1782, 69 S.Ct. 1359]; *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933]; *Robinson* v. *California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417]; *Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.3d 733]; *Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065].

the courts to make law consistent with the justices' predilections. Their legislatures were powerless to override them[5] as the judiciary claimed to derive its authority from a higher source. And the United States Supreme Court stayed its unifying hand; it has always followed Cardozo's teaching that "[a] judgment by the highest court of a state as to the meaning and effect of its own constitution is decisive and controlling everywhere."[6]

To concede the power, however, is not to justify every exercise of it. As a consequence of 15 years' state court activism, there is as much disparity in the rights of the citizens of the various states as there are states.

I respectfully submit that unless text or history[7] points to a difference in meaning, "the newly discovered separate and independent state constitutional interpretations"[8] are conceptually unwarranted as well as being unworthy in purpose. Our Supreme Court should repudiate this mischievous fiction.

---

[5] "As history amply proves, the judiciary is prone to misconceive the public good by confounding private notions with constitutional requirements, and such misconceptions are not subject to legitimate displacement by the will of the people except at too slow a pace. (Frankfurter, J., concurring in *A. F. of L.* v. *American Sash Co.*" (1949) 335 U.S. 538 at pp. 555-556 [93 L.Ed. 222, 232, 69 S.Ct. 258, 6 A.L.R.2d 481].)

[6] *Highland Farms Dairy* v. *Agnew* (1937) 300 U.S. 608, 613 [81 L.Ed. 835, 840, 57 S.Ct. 549].

[7] See Clark, J., dissenting in *People* v. *Pettingill* (1978) 21 Cal.3d 231, 253 [145 Cal.Rptr. 861, 578 P.2d 108].

[8] Richardson, J., dissenting in *People* v. *Disbrow* (1976) 16 Cal.3d 101, 120 [127 Cal.Rptr. 360, 545 P.2d 272].